**Clifford Eugene DAVIS et al.**

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD et al.**

**Civ. A. No. 1662–A.**

United States District Court, M. D. Louisiana.

May 1, 1981.

---

Robert C. Williams, Baton Rouge, La., for plaintiffs-intervenors Bryant, Potter and NAACP.

Franz R. Marshall, Sandra L. Beber, U. S. Dept. of Justice, Washington, D. C., C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-intervenor United States.

John F. Ward, Jr., Baton Rouge, La., for defendants.

JOHN V. PARKER, Chief Judge.

On September 11, 1980, the Court granted a motion for summary judgment on behalf of the United States and plaintiffs-intervenors, finding that after sixteen years of desegregation efforts the majority of children of both races in the East Baton Rouge Parish School System attend one-race schools and that 60 percent of the entire system consists of one-race schools.

The School Board was ordered to submit a proposed plan for desegregation of the public schools to become effective for the 1981 school year.

The School Board has submitted its plan, as has the government, and the Court heard evidence regarding both plans on March 4–6, 9–10, 1981.

On March 4, 1981, the Court also called upon all parties to face up to their responsibilities and to resolve their differences. A transcript of the Court's remarks, marked "Attachment A" is appended to this opinion. The Court ordered all parties to enter discussions and negotiations with a view toward a possible consent decree that would finally resolve this long-standing matter.[1] Discussions have been held under the direction of the Court but they have not proved fruitful.

The history of public school desegregation in the South consists largely of a litany of failure by local white elected officials to discharge their constitutional responsibilities. This case is no exception.

In its opinion of September 11, 1980, the Court found that the East Baton Rouge Parish School Board continued to operate a dual system of public education. Even after issuance of the initial court order in 1960, the dual system was perpetuated, at least in part, by the Board's penchant for constructing black schools for black children and white schools for white children, ignoring staff recommendations to the contrary. The Board still refuses to acknowledge its responsibility for selection of school sites, relying upon residential housing patterns over which it has no control as the cause of the dual system. The fact of the matter is that the Board did and does have control over school site selection and it has for twenty years utilized that control to increase, rather than decrease, segregation. Site selection, resulting in racially isolated schools of both races increases the difficulty, but does not excuse compliance with the Constitution. Neither in its plan nor in the

Court-ordered settlement discussions was a majority of the Board willing to actually desegregate the public schools. Therefore, the plan must be rejected, as will be discussed, and the settlement negotiations came to naught. Once more a chapter of failure of leadership, courage and wisdom on the part of local officials is written, and once more a federal district court is forced to order a local school board to comply with the law.

## I. *The Board's Plan*

The plan submitted by the Board, while it accomplishes some additional desegregation and has some interesting educational concepts, is basically a neighborhood school-voluntary magnet plan. The testimony establishes that at the outset the Board established criteria which excluded consideration of closing any schools as well as court-approved desegregation "tools," such as non-contiguous pairing or clustering of schools. Thus limited, it is not surprising that the School Board's plan cannot be accepted because it fails to dismantle the dual educational system "root and branch" as required by the Constitution. *Swann v. Charlotte-Mecklenberg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

The East Baton Rouge Parish System presently (1980–81) contains about 67,500 students; about 60 percent of them are white and about 40 percent black. There are 78 elementary schools with about 34,000 students, 18 junior high or middle schools with about 14,800 students and 16 senior high schools with about 18,600 students. The School Board presently operates Baton Rouge High School as a system-wide magnet school and Glasgow Middle and Istrouma Middle as system-wide middle magnet schools.

As pointed out in the September 11, 1980, opinion of this Court, a majority of the students now attend one-race schools and a majority of the schools are one race.

---

1. See opinion of September 11, 1980, D.C., 498 F.Supp. 580, for a summary of the history of the litigation.

The School Board's plan was explained by the Superintendent, Dr. Raymond G. Arveson, whom the Court accepted as an expert in school administration, and by virtue of his prior experience in Minneapolis, Minnesota, and in California, as an expert in public school desegregation. Dr. William Gordon, Professor of Education at the University of Miami, Ohio, and Dr. Larry A. Hillman, Professor at Wayne State University, both partners in HGH and Associates, served as consultants to the Board in the preparation of the plan. They also testified in explanation of the plan and plaintiffs and the government both conceded that they are eminently qualified in the field of public school desegregation since both have been employed in the past by the government in many such cases.

Mr. Larry Marshall, Associate Superintendent for Alternative Programs of the Houston Independent School District, was accepted as an expert in school administration and school desegregation.

Dr. Gordon Foster, Professor at the University of Miami, Florida, prepared the plan submitted by the government and was accepted by the Court as an expert in school desegregation. He testified in opposition to the School Board's plan.

■ The plan proposed by the School Board establishes three "magnet zones" running east-west across the parish. In each zone certain schools are designated as magnet or special focus high school, middle school and elementary schools. In addition, the Board is to expand the existing system-wide magnet schools. There are 26 elementary special focus schools, two of which are system-wide extended day care magnet schools. Many of these special focus programs are "added on" to the existing school structure so that, in effect, these will constitute a "school within a school." While all students would participate together in physical education and certain other activities, the classroom work would be separate for the magnet students.

The theory underlying the Board's proposal is that the various educational programs offered at the magnet schools would be so attractive to parents that they would elect to send their children to them. Since there is a limitation on the number of each type of special focus school in each zone, it is assumed that the school system would be voluntarily desegregated by the choice of the parents. Dr. Arveson, Dr. Hillman and Dr. Gordon were all of the opinion that this proposal will desegregate the East Baton Rouge Parish School System. None, however, could guarantee its success.

The School Board's magnet school plan requires a period of three years to implement. The testimony presented shows that convincing parents that these programs are worthwhile will require at least that length of time. In addition, it is conceded that some special focus programs probably will not be accepted but it cannot, without actual experience, be ascertained which ones. The "target" contained in the Board's proposal for magnet schools is:

"1981/82—8 percent of the opposite race

"1982/83—15 percent of the opposite race

"1983/84—25 percent of the opposite race."

Many of these special focus programs are located in one-race schools under the assumption that the attractiveness of the program offered will bring students of the opposite race.

The Board's proposal also pairs a few adjacent schools and clusters a few more. The Board's proposal admittedly leaves 18 one-race elementary schools (11 black and 7 white) which contain 3,500 black children and 4,200 white children. This is a total of 7,700 or some 23 percent of the elementary school enrollment. Moreover, the Board concluded that any school which contains more than 10 percent of the opposite or minority race was fully desegregated. There are an additional 21 schools (9 black and 12 white) which fall into this category of about 90 to 10 percent one-race. Thus, there are an additional 8,500 children (2,800 black and 5,700 white) attending what are essentially one-race schools in these twenty-one. When added to the 7,700 students in admittedly one-race schools (a total of 16,-

200), the Board's plan leaves some 48 percent of the elementary children still attending one-race schools.

Mr. Marshall of Houston testified that his school district, which contains blacks, Mexican-Americans and whites, was severely damaged when a desegregation plan similar to that suggested in this case by the government was imposed upon it. Mr. Marshall, who incidentally is black, testified that Houston, over the last several years, has carefully initiated a number of magnet schools, that they have proved very successful academically and that they are attracting students of all races because of their excellence. He highly recommends the use of magnet type schools and is of the opinion that over a period of years the Baton Rouge proposal would be successful educationally and that it would result in further desegregation. He concedes that neither Houston nor any other school system has ever proposed embarking upon a magnet program of such a vast scope as that of the East Baton Rouge Parish School Board.

The government's expert Dr. Foster agreed that the magnet school concept was educationally sound and that the Board should continue with those efforts.

The three existing magnet schools in the Baton Rouge system are clearly successful educationally, though they are somewhat less successful from a desegregation standpoint. Baton Rouge High School has only about 16 percent black students, after several years of operation, and Glasgow Middle School has only 19 percent black students after one year. Istrouma Middle, located nearer to black residential areas, has a 33 percent black enrollment in its first year. The School Board has now adopted a policy of controlling admissions to these magnet through the use of racial lists and it expects to substantially increase the minority participation in the magnet schools in 1981–82.

The proposal made by the School Board cannot be accepted because it leaves nearly half of the elementary students in one-race schools with no serious indication that the ratio will improve in the future.

Despite the fact that the Board's proposal cannot be accepted, the Board is impressed with the magnet school concept for improving the quality of education, and the Court urges the School Board to utilize that concept to the fullest extent practicable, considering its resources in both funding and personnel.

## II. *The Government's Plan*

As previously indicated, the government filed a proposed desegregation plan which was prepared by Dr. Gordon Foster. Dr. Foster has had a great deal of experience in preparation of court-ordered desegregation plans and has appeared as an expert witness in many cases, as have Dr. Gordon and Dr. Hillman.

The government's plan is a classic "pair 'em, cluster 'em and bus 'em plan." Many federal courts have adopted such plans and imposed them on school systems in the South; and in more instances than not, according to the testimony, such plans have resulted in a greater degree of segregation than that which existed prior to the court order.

The government's plan is not complete in all respects and was prepared at the Court's request as a suggestion of further steps which could be taken to desegregate the school system. Dr. Foster was not privy to all of the information available to the Board. For example, he had no pupil locater maps at his disposal, and the plan is based on 1979–80 enrollment figures since the government's plan was filed in May of 1980. Dr. Foster established a precise "range" of racial balance that he considered to be acceptable, which he defined as plus or minus 15 percent of the overall 60–40 make-up of the system. His "ranges" were from 25.4 percent black to 55.4 percent black as an acceptable desegregated school. The Court refuses to accept the proposition that it is necessary to define to the fractional percentage point an "acceptable" range of racial mix in any particular school. The jurisprudence is plain that the Court must look to the entire system in determining whether the public schools are desegregated.

The worst feature of the government's plan is that it arbitrarily pairs and clusters schools based strictly upon their racial make-up, as opposed to their location, the geography of East Baton Rouge Parish and the people who reside in it, as well as the children who attend the public schools. For example, the plan contemplates clustering Ryan and Harding Elementary Schools with Shenandoah Elementary School. Ryan and Harding are all-black schools located in a totally black residential area located between Louisiana Highway 19 and Plank Road in the northwestern portion of the parish, while Shenandoah, an all-white school, is located in an all-white residential area in the southeastern portion of the parish. As the crow flies, these attendance districts are nearly fourteen miles apart. By highway, the route would be much longer and would require traversing some of the most congested and dangerous highways in this parish. Many similar examples can be found in the government's plan.

All of the experts testifying on both sides agreed that the government's plan, if carried out, would effectively desegregate the school system, but the experts who testified for the School Board were unanimous in their opinion that the plan would within a short period of time result in disaster from an educational standpoint and that ultimately it would lead to resegregation on a massive scale.

The government's plan contemplated closure of only two schools; this was predicated upon Dr. Foster's understanding that the School Board did not wish to close schools, but he testified that it would be beneficial to the system for the School Board to consider closing other schools. The Board's consultants were of the same opinion. As previously noted, the Board, as a matter of policy, refused to consider closing any schools despite the recommendations of its staff and its consultants.

The government's plan anticipates that desegregation of the elementary schools would occur in the first year of operation and that desegregation of the secondary schools would fully occur in the second year.

It is interesting to note that despite Dr. Foster's best efforts, the government's plan leaves five elementary schools which do not meet the racially designated "range" and they remain as one-race schools. The government's plan also leaves one secondary school as 100 percent black.

While the Court cannot accept the government's plan for the reasons stated, there are, nevertheless, some sound ideas contained in the plan, and where groupings of various schools appear to the Court as sound, they will be incorporated into the plan adopted by the Court.

### III. *The Court's Plan.*

■ Finding that both plans presented by the parties are unacceptable, it becomes the duty of the Court to devise and order carried out a plan which will effectively dismantle the dual system of public education in East Baton Rouge Parish. In preparing the plan, the Court has borrowed freely from the School Board's plan and in some instances from the government's plan. Primarily, the Court adds mandatory attendance requirements to the School Board's plan, orders the closing of schools where appropriate and orders additional clustering of schools.

The Court is fully cognizant that long-distance transportation of young children can have adverse effects upon the children and, thus, upon the educational process which is sought to be fostered. Accordingly, the Court seeks to cluster and pair schools so as to utilize existing transportation facilities and to avoid both excessive travel time and dangerous routes. Although no evidence was offered in these areas, this Court is fully familiar with this community, including the natural barriers and hazardous traffic arteries.

The Court recognizes that there is community apprehension regarding the desegregation of the public schools and that parents whose children will be attending different schools in 1981–82 may be concerned for their safety. Accordingly, the School Board is hereby ordered to conduct a safety and security survey of each and every oper-

ating school in the system and to submit to the Court a specific plan for insuring the safety of each child attending the public schools of the parish. The security plan shall be submitted to the Court not later than July 1, 1981.

The United States Department of Justice is hereby ordered to monitor implementation of the desegregation plan, to report to the Court any failure to comply with its order, and to suggest additional measures which might appear necessary in order to insure compliance.

The Court is impressed with the magnet or special focus school as a concept for improving the quality of education, but, as noted earlier, is not convinced that a voluntary system of magnet schools on the scale proposed here will actually desegregate the system. To the extent consistent with mandatory attendance requirements, the Court intends to permit the Board to utilize the magnet concept.

The following plan for desegregation is hereby adopted and ordered implemented by the East Baton Rouge Parish School Board for the opening of schools in the fall of 1981.

*General*

Temporary buildings, which the Board has utilized to perpetuate all-white schools, are educationally unsound. All temporary buildings, except to the extent authorized herein shall be immediately removed and none shall be placed into service in the future without approval of the Court.

No new school shall be constructed, nor shall any addition to an existing school be constructed, without approval of the Court.

No school shall be closed without approval of the Court.

No closed school shall be reopened without approval of the Court.

The majority to minority transfer policy shall be maintained.

1. The design capacity shown on an attachment to the Board's plan is significantly higher for each school than that shown in this column. The Board contends, however, that the design capacity cannot be relied upon because of reduction in pupil-teacher ratios, special educa-

There shall be no segregation in the provision of transportation to and from schools.

No alteration in school attendance zones shall be accomplished without approval of the Court.

For the initial year of operation, rising high school seniors, that is, those who will graduate in 1982, are exempted from the provisions of this order where practicable.

For the initial year of operation, kindergarten children are exempted from the provisions of this order where practicable.

## Student Assignment

### Elementary Schools

The three school zones into which the Board divided the parish are accepted by the Court, with the exceptions noted hereafter.

For reasons stated below, the following elementary schools are hereby ordered closed.

| Name of School | B | W | Building Capacity [1] |
|---|---|---|---|
| Zone No. 1 | | | |
| Alsen | 131 | – | 486 |
| Port Hudson | 119 | – | 162 |
| North Scotlandville | 316 | – | 567 |
| Tanglewood Temporary Buildings | – | 207 | – |
| Bellingrath Hills Temporary Buildings | – | 324 | – |
| Zone No. 2 | | | |
| Zion City | 382 | – | 486 |
| Hollywood School | 241 | 50 | 486 |
| Capitol | 224 | – | 324 |
| South Greenville | 258 | – | 324 |
| Wyandotte | 208 | – | 216 |
| Fairfields | 215 | – | 216 |
| Sherwood Forest | – | 390 | 567 |
| LaBelle Aire Temporary Buildings | – | 296 | – |
| Riveroaks Temporary Buildings | – | 102 | – |

tion requirements and other factors. Subsequent to trial, the Board has delivered a listing showing revised capacities for each school and that is the source of the capacity figures listed here.

| Name of School | B | W | Building Capacity |
|---|---|---|---|
| **Zone No. 3** | | | |
| Perkins | 161 | – | 270 |
| South Boulevard | 294 | – | 324 |
| Northdale | 196 | – | 216 |
| Reddy | 318 | – | 594 |
| Southdowns | 55 | 215 | 486 |
| Shenandoah Temporary Buildings | – | 50 | – |
| Wedgewood Temporary Buildings | – | 170 | – |
| Parkview Temporary Buildings | – | 137 | – |
| Total | 3,018 | 1,941 | |

Total Students in Closed Schools – 4,957

As noted earlier, the Board refused to close any schools, despite the recommendations of its staff. All of the expert testimony was to the effect that it would be more economical and would contribute to the quality of education, as well as further desegregation, to close schools which are too small to be effectively operated, which are so old that they ought to be retired, or which are sounder-utilized that they are economically and educationally unsound. The schools here ordered closed for desegregation purposes also meet one or more of the closing criteria recited by the experts.

Alsen is 22 years old, has a declining enrollment, is used at only 24 percent of capacity and its enrollment is too small to be effective. The experts generally agree that 300 was an appropriate minimum enrollment for an elementary school. Moreover, Alsen is also a racially isolated all-black school located on the far western edge of the parish.

Port Hudson is 25 years old, is utilized at 57 percent of capacity, has a declining enrollment, has too few students and is a racially isolated all-black school at the far northwestern edge of the parish. It also ranks number seven on a "worst in category" list prepared by the Board. North Scotlandville falls into the same category as Port Hudson, except that it is located to the south of Port Hudson. Removal of temporary buildings at Tanglewood and Bellingrath Hills, both of which are one-race white schools, will require reassignment of 531 white children and is the equivalent of closing two racially isolated all-white schools.

In Zone 2, Zion City is 30 years old and, although used at 70 percent of capacity, is located in a racially isolated black area and is nearly surrounded by other all-black schools. Hollywood is 52 years old, was constructed originally as an all-white school which is now predominantly black, is used at 53 percent of capacity and, according to the Board's ranking, is number four on the "worst in category" list. Capitol is 21 years old and, although it is used at 62 percent of capacity, it is too small and is a racially isolated black school. South Greenville is 20 years old, is located near Capitol and falls into the same category. Wyandotte is 55 years old and, although used at 72 percent of capacity, is too small, is a racially isolated black school in the inner city of Baton Rouge and ranks number five on the Board's "worst" list. Fairfields, a formerly all-white school now all black, is 55 years old, is used at 66 percent of capacity, is racially isolated and ranks second on the Board's "worst" list. Sherwood Forest, although only 14 years old, is under-utilized, has a declining enrollment, and is a racially isolated all-white school constructed by the Board as a one-race school during prior attempts at desegregation. Removal of temporary buildings from LaBelle Aire and River Oaks, both all-white schools, is the equivalent of closing two more all-white schools.

In Zone 3, Parkins is 65 years old, is under-utilized, is too small, has a declining enrollment, is an all-black racially isolated school and ranks number one on the Board's "worst" list. South Boulevard, another all-black racially isolated school is 75 years old, is under-utilized, has a declining enrollment and is too small. Northdale is 19 years old and is used significantly but it is a racially isolated all-black school which will be converted into a fully desegregated extended day care magnet school. Reddy, another racially isolated all-black school, is 61 years old, is under-utilized, has a declining enrollment and is too small. Southdowns, a predominantly white school, is 31 years old, has

a declining enrollment, is located in a predominantly white residential area, is too small and ranks number thirteen on the Board's "worst" list. Removal of temporary buildings at all-white Shenandoah, Wedgewood and Parkview is the equivalent of closing two more all-white schools.

The following changes are hereby ordered in the elementary schools:

Wherever the Court has ordered the pairing of schools, the Board is hereby authorized to determine grade structures for each school. Wherever the Court has ordered clustering of schools, the School Board is hereby authorized to establish magnet or special focus programs at any or all of the schools in a cluster. The type of special focus program utilized will be within the discretion of the Board, within the limits of the mandatory attendance zones established by this order and within the limits of complete desegregation of each of the schools in the cluster.

### Zone No. 1

(1) Close Alsen, a 100 percent black school. All students shall be reassigned to Bakerfield.

(2) Close Port Hudson, a 100 percent black school. All students shall be reassigned to Zachary Elementary School.

(3) Close North Scotlandville, a 100 percent black school. All students shall be reassigned to Crestworth, to the Ryan-Brownfields-Tanglewood cluster below and to the Progess-Harding cluster below.

(4) Pair Baker Heights, an 79 percent white school, with Beechwood, a 100 percent black school.

(5) Crestworth will remain unchanged. It is an isolated all-black school located on the western edge of the parish in an entirely black residential area and there is no practical method available to effectively desegregate the school.

(6) Cluster Ryan, a 99 percent black school; Brownfields, an 85 percent white school; and Tanglewood, a 99 percent white school. Because of the removal of temporary buildings at Tanglewood, the Board shall reassign about 200 white students from the Tanglewood attendance zone to Parkridge in order to bring the enrollment within building capacity.

(7) Cluster Progress, a 100 percent black school; Harding, a 97 percent black school; White Hills, a 90 percent white school; and Parkridge, a 94 percent white school.

(8) Northwestern School remains unchanged. This school is presently fully desegregated.

(9) Pair Pride, a 75 percent white school, and Chaneyville, a 91 percent black school. Students in grades kindergarten through six will attend Pride and students in grades seven through twelve will attend Chaneyville.

(10) Bellingrath Hills is a 98 percent white school. It is located in the far northeastern part of the parish and is geographically near no other school, black or white. The Court concludes that because of its isolation it is impossible to effectively desegregate this school; however, because of the removal of temporary buildings, the School Board shall reassign 350 white students who presently attend Bellingrath Hills to the Pride-Chaneyville pair.

### Zone No. 2

(1) Close Zion City, a 100 percent black school. All students will be reassigned to the Merrydale-Lanier-Park Forest cluster and to Sharon Hills, a 70 percent white school.

(2) Cluster Merrydale, a 74 percent black school; Lanier, an 80 percent white school; and Park Forest, a 100 percent white school.

(3) Banks School remains unchanged. This school, now all black, was originally constructed as an all-white school. It is racially isolated, located in the northwestern portion of the parish in a completely black residential area, and the Court finds that there is no practical method available to effectively desegregate this school.

(4) Close Hollywood School. Hollywood, originally constructed as a white school, is now 83 percent black. The students shall

be reassigned to Banks or to the Delmont, North Highlands and Brookstown cluster and to Claiborne.

(5) Cluster Delmont, a 95 percent black school originally constructed as an all-white school; North Highlands, an 86 percent white school; and Brookstown, an 84 percent white school. The addition of about 100 black students from Hollywood School will effectively desegregate this entire cluster.

(6) Claiborne remains unchanged except for the additional students from Hollywood, about 50 white and 50 black.

(7) Close Capitol. All students shall be reassigned to the Howell Park-Greenville cluster below. Capitol is a 100 percent black school located in the center of an entirely black area and the students in this school will be reassigned to a fully desegregated cluster.

(8) Cluster Howell Park, a 63 percent black school originally constructed as a white school; Greenville, an 80 percent black school; Villa Del Rey, a 95 percent white school; and Red Oaks, a 98 percent white school. Because all temporary buildings are ordered removed, the School Board must readjust the LaBelle Aire attendance zone so as to add about 200 students from that school to this cluster.

(9) Melrose remains unchanged. It is at present fully desegregated.

(10) Winbourne remains unchanged. It is fully desegregated at present.

(11) Close South Greenville, a 100 percent black school. All students shall be reassigned to the Audubon-Broadmoor cluster and to Bernard Terrace.

(12) Bernard Terrace remains unchanged except for assignment of about 50 black students from South Greenville.

(13) Cluster Audubon, an 89 percent white school; Broadmoor, a 99 percent white school; Belfair, a 100 percent black school originally constructed as a white school; and Eden Park, a 100 percent black school. Students reassigned from South Greenville and from Sherwood Forest will fully desegregate this cluster.

(14) Close Sherwood Forest, a 98 percent white school. All students shall be reassigned to the Audubon-Broadmoor cluster.

(15) Close Wyandotte. All students shall be reassigned to the Delmont-North Highlands-Brookstown cluster and to Dalton, if capacity in the cluster is exceeded.

(16) Dalton remains unchanged. This a racially isolated, 95 percent black school which is surrounded by black schools, and the Court finds that as a practical matter it is impossible to effectively desegregate this school.

(17) Cluster LaBelle Aire, a 99 percent white school; Greenbrier, a 98 percent white school; Glen Oaks Park, a 64 percent black school; and Forest Heights, a 91 percent black school.

(18) Riveroaks remains basically unchanged. Since all temporary buildings must be removed, some 100 students must be reassigned, either to the Audubon-Broadmoor-Belfair-Eden Park cluster or to the LaBelle Aire-Greenbrier-Glen Oaks Park-Forest Heights cluster. Riveroaks is located in the south-central part of the parish in the heart of a very large all-white residential area, and the Court finds that it is impossible to effectively desegregate the school.

(19) Twin Oaks remains unchanged. This is a 99 percent all-white school which is located immediately east of Riveroaks on the eastern edge of the parish, and the Court finds that it is impossible to effectively desegregate this school.

### Zone No. 3

(1) Close Northdale and convert it into a system-wide extended day care magnet or special focus school. Those students now attending Northdale who do not remain shall be reassigned to Dalton and to Nicholson.

(2) Close South Boulevard and convert it into a system-wide extended day care magnet school. Reassign those students who do not remain to the LaSalle, Goodwood, Dufrocq, Cedarcrest-South cluster.

(3) Cluster LaSalle, a 92 percent white school; Goodwood, a 98 percent white school; Dufrocq, a 100 percent black school; and Cedarcrest-South, a 99 percent white school. The addition of students from South Boulevard and Perkins will effectively desegregate this entire cluster.

(4) Close Perkins. All students shall be reassigned to Goodwood cluster.

(5) Close Fairfields. All students shall be reassigned to Park.

(6) Park remains unchanged. This is a 98 percent black school located adjacent to Northdale in the western portion of the inner city of Baton Rouge. It is surrounded by all-black schools, and the Court finds that it is impossible to effectively desegregate this school.

(7) Bernard Terrace remains unchanged. This school is already effectively desegregated and some additional black students from South Boulevard will be reassigned.

(8) Nicholson remains unchanged, except that some students who do not remain at Northdale may be reassigned to this school. The school is at present 84 percent black, was originally constructed as an all-white school, and the addition of white foreign language students will further desegregate the school.

(9) Southdowns is closed. All students shall be reassigned to the Westminister-Westdale-Walnut Hills cluster.

(10) Cluster Westminister, a 98 percent white school; Westdale, a 74 percent black school originally constructed as a white school; and Walnut Hills, a 53 percent black school originally constructed as a white school. The students reassigned from Southdowns together with some additional students from Polk will effectively desegregate this entire cluster.

(11) Close Reddy. All students shall be reassigned to Polk and to the Highland-Magnolia Woods-Buchanan cluster.

(12) Polk remains unchanged. This is a 100 percent black school located in the western portion of the inner city and is surrounded by racially identifiable black schools. The Court finds that it is impossi-

ble to effectively desegregate this school, but as many black students as possible shall be transferred to the Westminister-Westdale cluster.

(13) Cluster Highland, a 90 percent white school; Magnolia Woods, a 79 percent white school; and Buchanan, a 100 percent black school.

(14) Pair Wildwood, an 81 percent white school, and University Terrace, a 78 percent black school.

(15) Pair Jefferson Terrace, an 87 percent white school, and Mayfair, a 45 percent black school. Since there is available capacity in this pair, the Board shall rezone an additional number of students from the Parkview attendance zone.

(16) Shenandoah, a 96 percent white school; Wedgewood a 99 percent white school; and Parkview, a 95 percent white school will remain unchanged. These schools are located in the extreme southeastern part of the parish and are surrounded by all-white schools in the midst of an all-white residential area. The Court finds that for all practical purposes they cannot be effectively desegregated.

In those instances where the Court has left racially identifiable schools unchanged, the capacity of the school as shown in the Revised Capacity Analysis submitted to the Court by the School Board shall, in no event, be exceeded. The School Board shall make every effort to keep attendance at those schools to a minimum, and shall, wherever possible, rezone attendance lines so as to include students from those schools into adjacent fully desegregated pairs or clusters. Students who are thus zoned out of the attendance district for racially identifiable schools shall not be replaced except by additional students of the minority race at the individual school.

In almost all instances the schools which are paired or clustered have at present contiguous attendance zones. In a few instances there are noncontiguous pairs or clusters, but in no instance will excessive travel time or transportation costs be incurred. In virtually every instance the stu-

dents who are reassigned from schools which are closed are reassigned into contiguous school zones or into contiguous pairs or clusters.

The Court recognizes that the system does not have as much unused capacity at the secondary level as at the elementary. Consequently, since Scotlandville High School is to be closed, some juggling of space may be required to accommodate those students in other schools.

As Dr. Foster suggested in the government's plan (PROPOSED DESEGREGATION PLAN, page 3), the Court's plan anticipates that desegregation of the elementary schools will occur prior to desegregation of secondary schools. As to elementary schools, the plan shall be fully implemented in 1981. The following plan for secondary school desegregation shall be fully implemented in the fall of 1982 except that Pride and Chaneyville shall be paired at all grade levels in 1981.

*Secondary Schools*

*Senior High Schools*

*Zone No. 1*

(1) Zachary High School

*Feeder Schools*

Zachary Elementary (as revised by closure of Port Hudson)
Northwestern
Bakerfield (as revised by closure of Alsen)
(2) Baker High School

*Feeder Schools*

(Cluster is shown in brackets.)
[Progress
[Harding
[White Hills (as revised to include 200 from Tanglewood)
[Parkridge
Baker Heights-Beechwood Pair
(3) Scotlandville High School

This institution will be closed. It is a 100 percent black school in a racially isolated area in the northwestern portion of the parish, and the Court finds that it is impossible to effectively desegregate. The School Board is hereby authorized to convert this school into an experimental system-wide voluntary magnet school as set forth in its plan for desegregation.

(4) Central High School

*Feeder Schools*

[Ryan (as revised by closure of North Scotlandville)
[Brownfields
[Tanglewood (as revised)
Crestworth
Bellingrath Hills
(5) Pride-Chaneyville

As previously indicated, Pride and Chaneyville are paired. Grades kindergarten through six will be at Pride and seven through twelve will be at Chaneyville. To the existing attendance zones for this pair, some 350 students from the Bellingrath Hills attendance area have been reassigned.

*Zone No. 2*

(1) Broadmoor High School

*Feeder Schools*

[Audubon (as revised by closure of Sherwood Forest)
[Broadmoor
[Belfair
[Eden Park (as revised by closure of South Greenville, 100 black students, and as revised by reassignment of 90 black students from Dalton)
Twin Oaks
(2) Belaire High School

*Feeder Schools*

[Forest Heights
[Glen Oaks Park
[Greenbrier
[LaBelle Aire
Greenville
Howell Park
Riveroaks
(3) Glen Oaks High School

*Feeder Schools*

[Lanier

[Merrydale

[Park Forest (including 280 black students from Zion City)

Sharon Hills (including 100 black students from Zion City)

Red Oaks (as revised to include 200 white students from LaBelle Aire Zone)

(4) Istrouma High School

*Feeder Schools*

[Brookstown

[Delmont

[Hollywood

[North Highlands

Claiborne

Winbourne

Melrose

Villa Del Rey

(5) Capitol High School

*Feeder Schools*

Banks

Dalton (as revised)

Park (as revised)

Capitol High is 100 percent black, is racially isolated in the inner, inner city, and the Court finds that there is no practical and effective means of accomplishing its complete desegregation. This school is named as sister school with Woodlawn High School and the School Board is hereby directed to develop a plan of close and complete cooperation between Capitol and Woodlawn to include regular joint faculty meetings, joint student body meetings, periodic rotation of faculty and administrative staff. The Board is directed to prepare and submit this plan to the Court for approval by July 1, 1981. The Board may install a magnet program at Capitol High School, for example, the petrochemical magnet, if it desires.

*Zone No. 3*

(1) Woodlawn High School

As noted above, Woodlawn High School and Capitol High School are declared sister institutions.

*Feeder Schools*

Shenandoah

Wedgewood

Jefferson Terrace-Mayfair Pair

(2) Tara High School

*Feeder Schools*

[Dufrocq (as revised by closure of Perkins and South Boulevard)

[Goodwood

[LaSalle

[Cedarcrest-South

Bernard Terrace

(3) Lee High School

*Feeder Schools*

[Walnut Hills (including 100 black students from Polk)

[Westdale (as revised by closure of Southdowns)

[Westminister

Polk

Nicholson

Parkview

The Board is authorized to install a magnet or special focus program at this school, if it desires.

(4) McKinley High School

*Feeder Schools*

[Buchanan (as revised to include 120 black students from Reddy)

[Highland

[Magnolia Woods

Wildwood-University Terrace Pair

The Board is authorized to add a gifted and talented secondary program at McKinley High School, if it desires.

*Junior and Middle Schools*

*Zone No. 1*

(1) All feeder schools in the Baker High School and Zachary High School area shall be clustered, and all students shall attend:

Baker Middle (sixth grade)

Crestworth Middle (seventh grade)

Northwestern Middle (eighth grade)

(2) All feeder schools in the Central High School Zone shall be paired, and all students shall attend:

Central Middle (sixth and seventh grades)

Scotlandville Middle (eighth grade)

(3) Pride and Chaneyville have been paired, and all students in both attendance zones shall attend the pair, together with the students reassigned from Bellingrath Hills.

## Zone No. 2

(1) All junior high-middle school students in Zone 2 shall attend the following clustered schools:

Sherwood Forest Middle (sixth grade)

Broadmoor Middle (sixth grade)

Park Forest Middle (seventh grade)

Prescott Middle (seventh grade)

Capitol Middle (eighth grade)

Glen Oaks Middle (eighth grade)

## Zone No. 3

(1) All feeder schools in the McKinley High School and Tara High School zones shall be paired and shall attend the following schools:

Valley Park Middle (sixth and seventh grades)

Westdale Middle (eighth grade)

(2) The Glasgow Middle Magnet School shall be relocated at McKinley Middle School in order that it may be expanded since the evidence shows that Glasgow Middle Magnet School is operating at capacity and that there is a waiting list. The School Board shall control admissions to the Middle Magnet School in accordance with its proposal to the Court for admissions into magnet schools.

(3) All feeder schools in the Lee High School and Woodlawn High School Zones shall be clustered and all students shall attend the following schools:

Southeastern Middle (sixth grade)

Glasgow Middle (seventh grade)

Kenilworth Middle (eighth grade)

*Magnet Schools*

The existing magnet schools, Baton Rouge High Magnet and Istrouma Middle Magnet, shall continue as presently operated except that the School Board shall control admissions in accordance with its proposal to the Court.

*Additional Requirements*

Where projected middle and senior high school attendance apparently exceeds capacity, the Board is authorized to request Court approval for installation of temporary buildings pending a permanent solution.

The Board is hereby prohibited from disposing of any temporary buildings which will be taken from service.

Where capacity problems are caused by reason of special education requirements, the Board is authorized to request Court approval of modifications in the plan.

The Board shall survey each of the schools ordered closed and shall submit to the Court, for approval, a specific plan for utilization of those buildings. The Board may want to consider installing magnet schools in some of those buildings, and the Board is hereby prohibited from disposing of any of those buildings without approval of the Court.

Where predominantly one-race schools have been continued, the Board is hereby prohibited from increasing the pupil-teacher ratio of 27 to 1 at the elementary level, and no grade in any such school may exceed that ratio.

The Board shall prepare and submit for Court approval a student transfer plan or policy regarding problem areas such as child care and children of Board employees.

*Faculty-Staff*

The Board shall prepare and submit to the Court for approval a faculty-staff employment and assignment policy that shall be in keeping with the *Singleton* rule.

## CONCLUSION

As Table No. 1 shows, this plan will effectively desegregate the East Baton Rouge

Parish public school system. Eleven essentially one-race elementary schools remain (there are presently 48) with a student population which will not exceed 2,600 black children and 3,400 white children, or 6,000 students out of a total enrollment of 34,000. Thus, about 82.5 percent of the entire elementary school enrollment will be attending fully desegregated schools and the remaining 17.5 percent will move into fully desegregated schools at the secondary level.

All students in the school system will attend fully desegregated schools at the junior high-middle school level. One high school, Capitol, remains as a 100 percent black institution, and Woodlawn will have only a 13 percent black enrollment. For reasons stated earlier, the Court has concluded that these schools should be made sister schools. A total of some 1,160 or 8 percent of the total high school enrollment, will attend all-black Capitol, while 7 percent of the total high school enrollment will attend Woodlawn, which will have an 87 percent white enrollment.

Viewing the system as a whole, the vast majority of all students will attend fully desegregated schools throughout the educational process and all students will attend fully desegregated schools at some level of their education.

The plan is as fair and equal as the Court could make it, in that the burden of desegregation falls upon both races and it falls uniformly throughout the parish. The Court concludes that this plan satisfies the mandate of the Constitution and judgment will be signed accordingly.

TABLE NO. 1
Projected Student Enrollment by Race
Under the Court's Plan

| Name of school | B | W | Percentage of Black Students |
|---|---|---|---|
| **Zone No. 1—High Schools** | | | |
| Baker High School | 745 | 995 | 43 |
| Central | 720 | 1050 | 41 |
| Pride-Chaneyville Pair (Junior and Senior High including 250 students reassigned from Central Middle because of removal of temporary buildings) | 287 | 774 | 27 |
| **Zone No. 1—Middle Schools** | | | |
| Baker Middle | | | |
| Crestworth Middle | | | |
| Northwestern Middle Cluster | 861 | 1252 | 40 |
| Central Middle | | | |
| Scotlandville Middle Pair | 547 | 770 | 41 |
| **Zone No. 1—Elementary Schools** | | | |
| Zachary (Port Hudson) | 239 | 426 | 36 |
| Baker Heights-Beechwood Pair (including 80 blacks from Bakerfield, and including 60 whites from Parkridge) | 337 | 466 | 42 |
| Bakerfield (Alsen) | 193 | 321 | 37 |
| Bellingrath Hills | 19 | 590 | 3 |
| Brownfields-Ryan-Tanglewood Cluster (including 165 black students from North Scotlandville and excluding 200 white students reassigned from Tanglewood to Parkridge) | 607 | 941 | 39 |
| Pride-Chaneyville Pair (Grades kindergarten through six at Pride and seven through twelve at Chaneyville including 350 white students reassigned from Bellingrath Hills Zone) | 143 | 534 | 27 |
| Crestworth (including 150 students from North Scotlandville) | 487 | 0 | 100 |
| Harding-Progress-Parkridge-White Hills Cluster (including 200 white students from Tanglewood) | 790 | 1035 | 43 |
| Northwestern | 165 | 259 | 40 |
| **Zone No. 2—High Schools** | | | |
| Belair | 845 | 2360 | 36 |
| Broadmoor | 530 | 1158 | 31 |
| Capitol | 1160 | 0 | 100 |
| Glen Oaks | 650 | 1300 | 33 |
| Istrouma | 660 | 990 | 40 |
| **Zone No. 2—Middle Schools** | | | |
| All Middle Schools in Zone 2 are Clustered | 3000 | 3900 | 43 |
| **Zone No. 2—Elementary Schools** | | | |
| Audubon-Broadmoor-Belfair-Eden Park Cluster (including Sherwood Forest white students and 100 black students from South Greenville) | 805 | 1160 | 41 |
| Banks (including 75 black students from Hollywood) | 531 | 1 | 100 |
| Brookstown-Delmont-North Highlands Cluster (including 115 black students from Hollywood) | 455 | 600 | 43 |

| Name of school | B | W | Percentage of Black Students |
|---|---|---|---|
| Zone No. 2—Elementary Schools—Continued | | | |
| Claiborne (including 50 black students from Hollywood and 50 white students from Hollywood) | 190 | 211 | 47 |
| Dalton (including 200 black students from Wyandotte) | 500 | 30 | 95 |
| Forest Heights-Glen Oaks-Greenbrier-LaBelle Aire Cluster | 717 | 1338 | 35 |
| Greenville-Howell Park-Redoaks-Villa Del Rey Cluster (including 200 white students from LaBelle Aire and 225 black students from Capitol) | 820 | 1175 | 41 |
| Lanier-Merrydale-Park Forest Cluster (including 280 black students from Zion City) | 725 | 1025 | 41 |
| Melrose | 175 | 135 | 57 |
| Riveroaks | 2 | 565 | 0 |
| Sharon Hills (including 100 from Zion City) | 240 | 330 | 42 |
| Twin Oaks (Note: If there is additional capacity in the cluster including Sherwood Forest, the Board shall assign additional white students from Twin Oaks to that cluster.) | 0 | 465 | 0 |
| Winbourne (including 25 black students from Dalton and including 25 white students from Dalton) | 160 | 210 | 43 |
| Zone No. 3—High Schools | | | |
| Lee High School | 700 | 970 | 42 |
| McKinley | 507 | 910 | 36 |
| Tara | 558 | 795 | 41 |
| Woodlawn | 175 | 1200 | 13 |
| Zone No. 3—Middle Schools | | | |
| Glasgow-Kenilworth-Southeastern Cluster | 573 | 1630 | 26 |
| Westdale-Valley Park Cluster | 800 | 1100 | 42 |
| Zone No. 3—Elementary Schools | | | |
| Bernard Terrace (including 60 black students from South Greenville) | 156 | 211 | 42 |
| Buchanan-Highlands-Magnolia Woods Cluster (including 120 black students from Reddy) | 478 | 743 | 39 |
| Cedarcrest South-Dufrocq-Goodwood-LaSalle Cluster (including 192 black students from South Boulevard and 161 black students from Perkins) | 685 | 987 | 41 |
| Jefferson Terrace-Mayfair Pair (including 125 white students from Parkview) | 260 | 755 | 27 |

| Name of School | B | W | Percentage of Black Students |
|---|---|---|---|
| Zone No. 3—Elementary Schools—Continued | | | |
| Nicholson (including 35 black students from Northdale and 35 foreign language students) | 213 | 86 | 77 |
| Parkview | 34 | 566 | 6 |
| Polk (including 161 black students from Perkins and 200 from Reddy, less 150 to Walnut Hills-Westdale-Westminister Cluster) | 455 | 0 | 100 |
| Park (including 215 from Fairfields) | 700 | 0 | 100 |
| Shenandoah | 23 | 537 | 4 |
| University Terrace-Wildwood Cluster | 285 | 630 | 31 |
| Walnut Hills-Westdale-Westminster Cluster (including 150 black students from Polk and 55 from Southdowns and including 215 white students from Southdowns) | 590 | 820 | 42 |
| Wedgewood | 9 | 580 | 2 |

## APPENDIX

### ATTACHMENT A

Transcript of the comments of the Court delivered in open court at the commencement of the trial in the above entitled and numbered cause, delivered in open court on Wednesday, March 4, 1981, at Baton Rouge, Louisiana.

(Excerpt)

The Court: I have requested that all the parties to this litigation be present at the start of this trial because I have something to say to you, to all of you, and I want to say it to you personally.

At the outset, I extend to the members of the East Baton Rouge School Board the court's gratitude and thanks for the spirit of cooperation that you have shown thus far in beginning to fulfill their responsibilities under the constitution of the United States of America by devising and presenting to this court a plan for further desegregation of the schools in this parish. I am pleased that at least one local school board recognizes that it has responsibilities under that constitution.

Next let me dispell any misconceptions, should anyone be laboring under one. Mark this: as nearly certain as human events can be, when the public schools of East Baton Rouge Parish open in the fall of

1981, they will open under a court order for further desegregation of the races in this school system. That order will call for the elimination of all vestiges of state imposed segregation, and as I have indicated, it will be effective in the fall of 1981.

(Colloquy between the court and Mr. Richard Thomas deleted, by order of court.)

I have made that statement to you, but I recognize that the school board has appealed this court's judgment of September 11, 1980 to the United States Court of Appeals for the Fifth Circuit, as you have every legal right to do. However, I say to any of you who might think that the Court of Appeals is likely to reverse this court's decision that you are relying upon a false hope. I make that statement not out of any degree of arrogance or because I believe that I am always right or infallible. I have simply studied the decisions of the United States Supreme Court and of the Court of Appeals in this area of the law, and I have also studied the facts of this case, the undisputed facts which were presented to me and which served as the basis for my decision of last September. Based upon that study and my thirty years of practice as a lawyer, I can tell you and do tell you, members of the school board, in all candor, that your appeal has only a miniscule chance for success.

So I bring you back to my first statement. Mark it down that the schools of this parish in the fall of 1981 will open under this court's order for further desegregation.

Now, I am also aware of, and I have even examined proposed legislation which has been introduced into the Senate of the United States and which relates to the transportation of students for the purpose of achieving racial balance in the public schools. If there are those among you who have the impression that this legislation will delay further desegregation of the East Baton Rouge Parish Schools, you are wrong.

Assuming that the Congress actually does adopt such a statute—and that is a large assumption to make—the Congress cannot and will not attempt to repeal or modify the Constitution. Should applicable legislation actually be adopted, there will be ample time to incorporate its provisions in the plan for further desegregation which will go into effect when schools open in the fall of this year.

Some of you may harbor the expectation that a new Presidential administration and a new Attorney General of the United States might somehow prevent or delay this court's ordering further desegregation of the school system in the fall of 1981. If that is your hope, then I tell you it is a false hope. In the first place, neither the President of the United States nor the Attorney General dictates this court's decisions. In the second place, it is my prediction that the new administration will prove no less dedicated to the cause of constitutional rights for victims of past racial discrimination than have prior administrations. Finally, on this subject, and in the third place, even were the Department of Justice to withdraw entirely from this litigation, the plaintiffs-intervenors would remain in the case, and I can assure you that they and their attorneys are fully capable of standing alone, as they have in this litigation for many years, to demand their constitutional rights.

Thus, I say to you, in all modesty and humility, the Court of Appeals will not overturn my decision of last September. I further say that there will be no respite by any legislation adopted by the Congress. And finally I say that the new administration in Washington will not delay implementation of further desegregation of the public schools of this parish in the fall of this year.

I trust that I have now gained your undivided attention. I hope that I have, because I want to briefly comment upon the desegregation plans which have been filed in this court record. I have examined both plans, the one submitted by the U. S. Attorney's Office and the Department of Justice, as well as the one submitted by the school board. I am compelled to comment that both appear to be lacking in some respects.

Now, let me hasten to make clear that I make no ruling at this time. I have not yet heard the evidence in this case. And the court's decision, of course, must be based exclusively upon the evidence and the applicable law. I simply want to share with the parties to the litigation my initial reaction to the positions which you have staked out in this litigation. This is something that judges frequently do with the lawyers in a case, and sometimes with the parties. It often helps to clarify matters and to more precisely define seriously contested issues.

My reaction to the government's plan, and as I understand it that plan is concurred in to a greater or lesser degree by the plaintiffs-intervenors, is that this proposal appears to require transportation of young children for long distances over some of the most dangerous traffic arteries in this parish, which I also know are some of the most dangerous traffic arteries in the State of Louisiana, and viable alternatives appear to exist. Moreover, this plan appears to so fractionate elementary schools that children will be constantly changing schools throughout their educational process.

Let me make it plain that I do not consider school children as so many sticks of black and white dots to be shifted around and around in order to satisfy some mostly illusory racial numbers game.

Turning to the school board's plan, I note that your own projections indicate that there will still be some thirty-nine one-race schools after full implementation. You will have to produce some very powerful evidence to convince this judge that you have already tried all the tools of desegregation on those thirty-nine schools without avail.

I am also concerned about the school board's plan in that on the very two first pages you request a delay of some three years in full implementation. The time for delay has long since expired.

Again, I remind you, I do not here make any ruling. My ruling will be based upon the evidence and the law. I am simply sharing my thoughts with the parties to the litigation at this time. And of course I am sharing those thoughts with the attorneys in the case as well.

I want you now to take a pragmatic look at where all of you stand at this time. As I have made it plain, I think, it is virtually inevitable that a plan for further desegregation of the schools of this parish will be implemented in the fall. At this time no one, not even I, knows what that plan will be, because I have not yet heard the evidence and there has been no decision made.

The plan submitted by the government might be adopted. If that happens, then certainly the school board will enter another appeal, and I must advise you that that appeal, like the presently pending appeal, will not cause any delay in implementation in the fall of 1981.

On the other hand, the court might adopt the plan submitted by the school board. That would trigger two appeals, by the plaintiffs-intervenors, and by the Department of Justice.

And this is the more likely result, that the court might not adopt either plan, but instead fashion its own, perhaps choosing parts of both plans, perhaps choosing none of either. In that event, we will have three appeals, first by the school board, second by the plaintiffs-intervenors, third by the Department of Justice.

Pragmatically and realistically, then, all parties to this litigation face implementation of an as yet unknown plan for further desegregation in the fall of this year. You face further litigation without regard to the decision that this court makes, because regardless of what decision this court makes, one or more of you will enter an appeal to the United States Court of Appeals, and perhaps even to the Supreme Court of the United States.

Consequently, the uncertainty and expense of litigation will continue, regardless of this court's decision. Isn't that ridiculous? This case has been going on for twenty-five years, and more, and it appears to be no closer to a final termination than it was on the day it was filed. Yes, that is ridiculous. And under these circumstances,

I suggest to all the parties that none of you have anything to lose by sitting down and discussing this situation with each other and frankly exploring the possibility of a consent decree to finally resolve and put an end to this long-standing litigation.

Now, I am acutely aware that we deal with constitutional rights in this litigation, and no one expects nor would this court permit constitutional rights to be bargained away in a consent decree. However, as all of you must be aware, in a school system which is as large and complex as that of East Baton Rouge Parish, there are multiple methods for fulfilling the constitutional mandate to achieve a unitary school system while at the same time maintaining quality public education.

The great advantage to a consent decree, as I see it, would be the termination of this litigation and the creation of certainty of result for all concerned: the parties to the litigation, the students in our school system, teachers, parents, and the community at large. I see no disadvantage to any party, or to anyone in the community if you at least explore the possibility of fashioning a consent decree among yourselves.

None of you knows what plan the court might come up with, and as we have seen, whatever that order is, it is going to produce further appeals, which will prolong the uncertainty. And let me frankly tell you that such appeals will not necessarily promote either quality education or a meaningful unitary school system. Now, I recognize that no party to the litigation wants to come forward with such a suggestion because you are afraid that it might be taken as an indication of fear that your side has a weak case. This court has no such inhibition, because this court has no side in this case, or in any other case.

I suggest to you that all of you, as well as the community itself, are more likely to be satisfied, better satisfied, knowing none of you will be entirely satisfied by any plan, but that you are more likely to be better satisfied with a plan that you yourselves, the parties to the litigation, devise, than one which is fashioned by the court, either this court or an appellate court.

If there is anything that has been proved over and over and over again in the history of litigation of this nature, it is that courts are poorly equipped to provide quality education.

I have often maintained to people from other parts of this country that we here in the south would be the first to resolve our racial problems and disagreements. Many of these people have expressed surprise at my viewpoint, since they are fully aware that we in the south have not been free of racial strife, discord, animosity, sometimes even violence, bigotry, sometimes demagoguery. But I say to you that beneath the surface turmoil there has always existed and there exists today a mutual good will, respect, understanding, liking, even love between most black and white Southerners. After all, we have lived here together for several hundred years. We have together endured floods, war, depression, pestilence, and many other calamities, as well as an occasional triumph. We know each other. And we have the ability to communicate with each other, to make ourselves understood by each other. I continue to believe that Southerners can live with each other in peace and with mutual respect for the rights of each other in the public schools, as well as in other areas of life.

In this case, at this time, the parties' stated positions are far, far apart. No one of you seems to see much if anything of value in anybody else's proposal, but I say to you that your differences are not insurmountable. If all of you will approach this situation not as gladiators, not as protecting a, quote, side, close quotes, not as vindicating your own views and opinions, but as a great opportunity to revitalize the public school system in this parish—and certainly that system is now receiving more attention than it has in recent memory—then you may here create a quality system of education based upon real and equal opportunity for all.

All of you know in your hearts that some day, somehow, that must occur. Southern school systems ought not to and cannot

remain the wards of the federal courts forever. Local public officials must some day in the south assume and discharge their full responsibilities, not just under state and local laws, but under the Constitution of the United States. I remind you—because it is sometimes forgotten—that Louisiana is a part of the United States, and has been since 1803, and that Baton Rouge is a part of Louisiana. Hence, Baton Rouge is subject to the provisions of the Constitution of the United States. And you, local public officials, have taken the same oath to uphold and defend that constitution that I have. And I expect you to fulfill your oath, even as I will absolutely fulfill my oath. Let there be no mistake or misunderstanding about it. Some day, somehow, quality public education based upon equal educational opportunity for all must come about, and it must be done by local public officials. I ask you, why not now? Why not here? In Baton Rouge? In Louisiana? In the United States of America? Why not in this place and at this time?

Let me say that the East Baton Rouge Parish School Board has already demonstrated leadership, courage and wisdom in working out a consent decree that resulted in reapportionment of this board, a consent decree which I approved and I signed. A much greater measure of leadership, courage and wisdom will now be required of you, members of that board, in fashioning a consent decree in this case, for the stakes are much greater.

I suggest to the plaintiffs-intervenors and their counsel that you could—you should consider the board and each member of the board to be in good faith, even though you disagree with some or all of the board's proposals. And in equal good faith, you ought to sit down and explore the possibility of amicable resolution of this litigation.

I will remind you that after all, you are not infallible either, and every dollar that this board can save on litigation can be spent on education.

I enjoin the Department of Justice that you place no obstacle in the way of a consent decree in this case, and that on the contrary, you lend every effort to a good faith resolution of the matter on a permanent basis. This court has not the power to require that any of you consent to anything, but it can require that you meet with each other and that you discuss these issues with each other, and that is exactly what I am going to do.

For the foregoing reasons the court now orders that each member of the East Baton Rouge Parish School Board, together with the superintendent and such other staff personnel as the board may desire shall, and of course with their attorneys, shall confer with representatives of the plaintiffs-intervenors and the Department of Justice and their attorneys at nine o'clock a. m. on Wednesday, March 11, 1981. That meeting will take place in this court's chambers. It will be a private meeting. No one will be allowed in, except the people I have named.

Now, you may meet there for as long or as short a period of time as you desire, but, you will not be permitted to leave until you have compiled a written listing of specific matters of difference between you for further discussion. The matters, of course, will relate to a desegregation plan to be implemented in the fall of 1981.

This list will be submitted to the court and it will serve as your agenda for further discussion. You will meet again on Thursday, March 12, and on Friday, March 13. You may meet at such time or place as you desire for the subsequent meetings. My chambers will be open to you should you desire to continue your meetings there, but you will of course be free to meet at any place you choose. All that I require of you is that you meet and actually discuss the matters on the agenda which you will have prepared. If there can be no agreement among you on the first item, then you will put it aside temporarily and go to the next item on the agenda, to see if you can come to some accommodation or meeting of the minds on that item, and then you will go on and on down the list.

Your conferences and communications with each other will continue on Monday,

March 16 through Friday, March 20. Each of you is hereby ordered directly by this court to attend each of these conferences on the dates that I have indicated even though there has been no resolution of any matter of difference between you. You are further ordered, each of you, to discuss these issues with each other. Your conferences, except for the first which I have indicated will be private, may be either open to the public, or private, at your option. If you choose to meet in private, I assure you that this court will see to it that you are not disturbed or interfered with. The only parameters which the court places upon your discussions, other than the agenda which I have outlined, is that you address the criteria set forth in this court's opinion of September, I think it's the 11th, 1980. And of course you have to bear in mind that the first listed criterion in that opinion, quote, to achieve a unitary school system, close quote, shall be paramount.

Now, not later than Tuesday, March 24, 1981, at ten o'clock a. m., you will report to this court as to whether the preparation of a consent decree is probable or improbable. Thereafter, and obviously depending upon the nature of the report that you render to the court, your conferences may or may not continue. However, should your efforts prove successful—and pray God they do—there must be a series of public hearings, or meetings, during which teachers, students, parents, and the public at large may be heard prior to the submission of a formal consent decree to the court. If this becomes necessary, the court will establish a time-table and the details surrounding these meetings.

It may be that the task which I have set before you is too great. I pray not. I continue to believe that this community does possess, on all sides of this case, the leadership, the courage, and the wisdom needed to resolve this controversy in a constitutional manner, and without damage to the public school system.

Time is very short, if you are to accomplish the task. This court will not delay a decision of this case; nor implementation of the desegregation plan for the fall of 1981 in the hope of obtaining a consent decree. Let no one be misled by the court's preference that you resolve your own differences. All of you may absolutely rely upon the fact that if you do not resolve your differences, I shall, and promptly.

I am giving to you, both the individual plaintiffs, the individual members, the elected members of the East Baton Rouge School Board, the opportunity to face up to your responsibility under the laws of this land. I hope, I hope that you can do so.

We will now begin the trial of this case, and it will continue without interruption, except for normal court business on Friday, until it is concluded. If necessary we will cancel or reassign or Judge Polozola will try the other cases that I have assigned to try for next week. All of the evidence will be submitted at this time. And as I have indicated, I will not delay my decision.

I do not require the personal attendance of any of the plaintiffs-intervenors or any individual members of the school board for any of the remaining portion of this trial. All of you are of course welcome to stay or to come and go as you wish during the course of the trial, but I wanted to say what I have said to you personally, without filtration through attorneys or anyone else. I have shared with you my innermost thoughts about this case. All of you may now leave if you desire. You may remain if you desire.

–O–O–O–O–

(At this point evidence was taken by the court, after which the court amended the above statement as follows:)

–O–O–O–O–

The Court: Before we recess for the evening, I want to amend in some respects the order that I handed down when court opened today relative to the East Baton Rouge Parish School Board. I recognize that public officials have problems that are perhaps peculiar to public officials and that private litigants do not have.

890

Accordingly, the order that I handed down this afternoon is hereby amended so that the members of the East Baton Rouge Parish School Board are hereby ordered and directed between now and the date of the first conference which I have ordered to meet among themselves privately, to discuss among themselves in private the issues of this litigation and possibly resolution of this litigation, to informally poll and vote among themselves as to various possible courses of action. They are further authorized to meet in my chambers for these private sessions, and they will be under the auspices of this court, and this court will protect and defend them against all who might seek to interfere with them. All they need to do is to let me know when they want to meet and I will arrange an appropriate meeting place in this courthouse.

All right, now we adjourn. Thank you.

(At this time court adjourned for the day.)

Reporter's Certificate

The undersigned official court reporter, United States District Court for the Middle District of Louisiana hereby certifies the above and foregoing eighteen pages constitute the stenographic record of the comments of the court delivered at the commencement of the trial in the above entitled and numbered cause on Wednesday, March 4, 1981, by the Honorable John V. Parker, United States District Judge, at Baton Rouge, Louisiana; and further certifies that said transcript was prepared by her and is true and correct to the best of her knowledge and ability.

Baton Rouge, Louisiana

March 4, 1981

(s) Estella O. Champion

    Estella O. Champion, CSR, RPR

    Official Court Reporter