Clifford Eugene DAVIS, Jr., et al.,
Plaintiffs-Appellees,

v.

EAST BATON ROUGE PARISH
SCHOOL BOARD, et al.,
Defendants-Appellants.

Clifford Eugene DAVIS, Jr.,
Plaintiff-Appellee,

and

Dr. D'Orsay D. Bryant, et al., Plaintiffs-
Appellees, Cross-Appellants,

and

United States of America,
Plaintiff-Appellee,

v.

EAST BATON ROUGE PARISH SCHOOL
BOARD, et al., Defendants-Appellants,
Cross-Appellees,

Parents For Neighborhood Schools, Inc.,
A Louisiana Corporation,
Movant-Appellant.

Clifford Eugene DAVIS, Jr., et al.,
Plaintiffs-Appellees,

and

United States of America,
Intervenor-Appellee,

v.

EAST BATON ROUGE PARISH
SCHOOL BOARD, et al.,
Defendants-Appellants.

Nos. 80-3922, 81-3476, 82-3298
and 82-3412.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1983.

See also 533 F.Supp. 1161, 541 F.Supp. 1048.

John F. Ward, Jr., Baton Rouge, La., for East Baton Rouge Parish School Bd.

Robert L. Hammonds, Baton Rouge, La., for East Baton Rouge Parish School Bd. in Nos. 82–3298 and 82–3412.

Franz Marshall, Sandra Lynn Beber, James Philip Turner, Dept. of Justice, Washington, D.C., C. Michael Hill, Asst. U.S. Atty., Baton Rouge, La., for plaintiffs-appellees in No. 80–3922.

Jack N. Rogers, Michael R. Connelly, Baton Rouge, La., for Parents for Neighborhood Schools, Inc.

Standford O. Bardwell, Jr., Baton Rouge, La., for U.S. in No. 83–3412.

Theodore M. Shaw, NAACP Legal Defense Fund, New York City, for plaintiffs-appellees in No. 80–3922.

Bill Lann Lee, Jack Greensberg, NAACP Legal Defense Fund, New York City, for plaintiffs-appellees in No. 80–3922 and plaintiffs-appellees cross-appellants in No. 81–3476.

Napoleon Bonaparte Williams, Jr., NAACP Legal Defense Fund, New York City, for plaintiffs-appellees cross-appellants in No. 81–3476, plaintiffs-appellees in No. 82–3298, and NAACP in No. 82–3412.

J. Harvie Wilkinson, III, Deputy Asst. Atty. Gen., Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiffs-appellees in No. 80–3922 and U.S. in No. 81–3476.

Mildred M. Matesich, Atty., Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiffs-appellees in No. 80–3922, and U.S. in Nos. 82–3298 and 82–3412.

Brian K. Landsberg and Marie Klimesz, Attys., Civ. Rights Div., Appellate Sect., Dept. of Justice, Washington, D.C., for U.S. in Nos. 82–3298 and 82–3412.

Robert C. Williams, Baton Rouge, La., for plaintiffs-appellees in No. 80–3922, plaintiffs-appellees cross-appellees in No. 81–3476, and plaintiffs-appellees in Nos. 82–3298 and 82–3412.

Before REAVLEY, RANDALL and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

This twenty-seven year old school desegregation case is before the court for the fourth time. We are now called upon to review the district court's 1980 summary judgment that the East Baton Rouge Parish (EBRP) school system remained a dual system and to review the district court's imposition of a detailed plan for achieving the measure of desegregation required by the Constitution. Also before us is that court's denial of a motion to intervene filed by a group of citizens of Baton Rouge. We affirm each decision and remand the cause to the district court for further proceedings.

I. *The Story Thus Far*

The East Baton Rouge Parish school system was historically segregated by law. This action was filed in 1956, just after the Supreme Court's landmark *Brown* decisions. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*); *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). The early history of the litigation has been recounted in previous decisions of this court and need not now be repeated. *See Davis v. East Baton Rouge Parish School Board,* 570 F.2d 1260 (5th Cir.1978), *cert.*

*denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *East Baton Rouge Parish School Board v. Davis,* 287 F.2d 380 (5th Cir.), *cert. denied,* 368 U.S. 831, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961).

In 1970, acting pursuant to court order, the Board responded to our decision in *Hall v. St. Helena Parish School Board,* 417 F.2d 801 (5th Cir.), *cert. denied,* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969), by formulating and instituting with district court approval a plan coupling neighborhood attendance zones with a majority-to-minority transfer provision allowing a student to transfer from a school in which his was the majority race to one in which his race was in the minority. Four years later, plaintiffs [1] filed what was by that time their fifth motion for further relief. They alleged that the 1970 plan was not desegregating the system effectively. Specifically, they cited the many one-race or substantially one-race schools remaining in the system, and asserted that the Board had built new schools in the white areas of the parish while allowing the black or predominantly black schools to deteriorate. They also alleged that the Board was assigning less experienced teachers to black or predominantly black schools. The Board opposed further relief, arguing that it imposed no affirmative racial barriers to admission to any of its schools and that conscious racial balancing was illegal under *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*). It also sought dismissal of the case on the ground that the EBRP schools had been operated as a unitary system during each of the four school years since the 1970 plan went into effect.

The district court held a hearing and on August 14, 1974 appointed the Louisiana Educational Laboratory (LEL) to review the EBRP school system and to recommend steps to bring it into compliance with the court's previous desegregation orders and with "present constitutional requirements." [2] Upon receiving LEL's interim report, the district court granted preliminary relief in February 1975. It ordered the Board to appoint a black to fill a vacant policy-making position on the Board's staff and to provide public transportation to those students electing to take advantage of the majority-to-minority transfer provision.[3] After an evidentiary hearing and further briefing, the district court found that the Board had done everything constitutionally necessary to eliminate EBRP's dual school system. The court therefore declared the system unitary and dismissed the case.

We vacated the district court's judgment and remanded for more specific findings. 570 F.2d 1260 (5th Cir.1978). Addressing student assignment first, we noted the presumption under *Swann* against the maintenance of a school system with substantially one-race schools. *Id.* at 1263; *see Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. With that presumption in mind, three facts led us to vacate and remand: first, of the 110 schools in the parish fully 20 had student bodies comprised solely of black children; second, over half of the parish's schools had student

---

**1.** Among the plaintiffs in this litigation are the original plaintiffs, of whom the first named is Clifford Eugene Davis, Jr., plaintiff-intervenors D'Orsay Bryant and Alphonso O. Potter, plaintiff-intervenor the Baton Rouge Branch of the National Association for the Advancement of Colored People (NAACP), and plaintiff-intervenor the United States. Unless more particularity is called for, they will be referred to collectively as plaintiffs.

**2.** Plaintiff-intervenors Bryant and Potter noticed an appeal from the district court's August 14, 1974 order, but withdrew the appeal after the district court issued a minute entry clarifying that its order appointing an outside expert was not final.

**3.** It also reorganized the Board's biracial committee into a court-appointed advisory body and directed the Board to give consideration to establishing magnet schools, restructuring neighborhood attendance zones, and appointing more blacks to the Board's central staff. R. 876–79; *see Davis,* 570 F.2d at 1262 n. 3.

bodies that were ninety percent or more of one race; and third, over half of the black children in the parish attended schools that were "essentially all black." 570 F.2d at 1263. For lack of specific findings, we could not conclude that the Board had met its heavy burden of justifying the continued existence of so many substantially one-race schools with so great an impact on the black children of the parish. We therefore directed the district court to evaluate whether any of the remaining one-race or essentially one-race schools could be eliminated by use of one or more alternatives to the neighborhood school concept. In this regard, we mentioned *Swann*'s examples of possible desegregation tools: "the remedial altering of attendance zones or the pairing and clustering of noncontiguous school zones." *Id.; see Swann,* 402 U.S. at 28–31, 91 S.Ct. at 1282–83. Finally, we noted the importance of specific findings "to allow us to determine rather than speculate that the law has been correctly applied." 570 F.2d at 1263–64 (quoting *Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 433 (5th Cir. 1977)).

We reserved decision on appellant's claim that the seniority-based teacher reassignment plan then in effect had left the more experienced teachers in the white schools and sent those with comparatively less experience to the essentially all-black schools. We directed the lower court to consider the effect of this plan in light of the two purposes to be achieved—desegregation and quality education. We also included in our remand all other contentions made in plaintiff-intervenors' motion for further relief, including their allegations of discrimination in new school site selection and construction, in funding decisions, and in the use of the biracial committee.

Immediately upon our remand, both the United States [4] and, later, plaintiff-intervenors moved the district court to set a hearing and to require the Board to consider the alternative desegregation methods men-

tioned in our opinion. In July 1979, the district court entered an order proposed by plaintiff-intervenors requiring the Board to submit a report on possible alternative desegregation methods. While the Board was preparing that report, the United States moved to intervene pursuant to section 902 of the Civil Rights Act of 1964, 42 U.S.C. § 2000h–2 (1976). The district court granted leave to intervene on March 11, 1980.

The Board's staff report, submitted in November 1979, concluded that the EBRP school system had already attained unitary status. In the alternative, it found the prospect of "pairing and clustering" to be "totally unsound from an educational and administrative viewpoint." It recommended the "magnet school" concept as "the most viable and feasible of the alternatives." The possible use of magnet schools—those with special programs to attract voluntary attendance across racial lines—was described in somewhat greater detail in a separate report, but the Board submitted along with these reports a resolution of the biracial committee disagreeing with the Board's staff report and recommending instead that a plan be instituted to assign students in such a way as to achieve student populations at each school reflecting the racial percentages · that existed throughout the system.

In a thoughtful minute entry dated March 28, 1980, Judge John V. Parker described the terms of our remand and set out the procedure he would follow to comply with our directions. He set a hearing, outlined in general terms the burdens each party would bear, and invited the parties to submit any specific proposals they might have to maximize desegregation of the system.

The United States submitted its plan on May 15, 1980. Developed by Dr. Gordon Foster, the United States' plan was later characterized by the district court as "a classic pair 'em, cluster 'em and bus 'em plan." 514 F.Supp. 869, 873 (M.D.La.1981). Dr. Foster established that roughly 60% of the EBRP school system's students were

---

4. At the time, the United States appeared only as amicus curiae.

white and 40% were black. He then defined a "predominantly one-race school" to be one with a student body 90% or more of a single race; he found 65 of the 98 schools in the system when Dr. Foster compiled his statistics that were predominantly one-race. Finally, he considered a school to be "racially identifiable" if the racial percentages reflected in the school's student body fell outside a range of 15 percentage points from the racial percentages reflected in the student population of the system as a whole. Thus, an EBRP school would be racially identifiable if the black students in its population comprised less than 25% or more than 55% of the whole; of the 98 schools, he found 81 identifiably white or black. The major objective of the Foster Plan, then, was to reassign students to minimize the number of racially identifiable schools "to the greatest extent possible." This it would do with "the remedial altering of attendance zones or the pairing and clustering of noncontiguous school zones." 570 F.2d at 1263. The plan was minutely detailed in its description of the pairs, clusters, and attendance zones it proposed to move the parish toward a unitary school system. Plaintiff-intervenors concurred in the Foster Plan a few weeks later. The only change they proposed was that Dr. Foster's "plus or minus 15%" formula be applied to magnet schools as well as those without magnet programs.

The Board also responded to the district court's request for "specific proposals." On May 16, 1980, it submitted a memorandum arguing once again that its schools had been operated as a unitary system since 1970. It recognized "the existence of some schools with student bodies composed of students of only one race." This the Board proposed to correct by establishing three magnet schools in the parish—one high school and two middle schools. Also, argued the Board, a sub-committee of its Magnet School Committee had just recommended that a second magnet be created at the high school level with a "vocational-business"

program. Thus, the Board requested that the district court again declare the system unitary and dismiss the case. The court declined to do so.

A month later, on June 16, 1980, the Board submitted its critique of the Foster Plan. It attacked the plan as calling for disruptively long bus rides and for a massive reassignment of teachers. It urged that specific racial percentages not be applied to magnet schools, for such an admissions policy contradicted the whole concept of a magnet program. It also attached two reports. The Instructional Division objected to the plan because it paired schools with student bodies of "diverse social, economic, curricular, and locational differences." The Transportation Division estimated that the plan would require a total of 182 new buses at a total cost of over $5 million.

The United States moved for partial summary judgment in August 1980 on the question of "liability"—whether the system remained dual—and proposed to leave the question of remedies for trial. As required by local rule, the Government submitted with its motion a list of 49 undisputed facts to support a finding that the system remained dual. These facts detailed the de jure segregation that existed in 1954. They described the Board's construction of new schools since 1954, revealing that for the quarter century since *Brown I* the parish had simply built schools for white children and schools for black children, with only a startlingly few placed to serve an interracial student population. They included the student attendance statistics mentioned in our 1978 opinion indicating that the parish school system remained a substantially segregated one. Finally, they indicated that the Board had assigned a disproportionate number of inexperienced teachers to predominantly black schools.

The Board responded to the Government's motion by admitting all but one of the undisputed facts.[5] The Board stated

---

**5.** The last of the undisputed facts related to the Board's interpretation of our decision in *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.), *rev'd in part sub nom. Carter v. West Feliciana Parish School Board,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d

another undisputed fact—that it does not assign children to schools on the basis of their race—and asserted that there was factual dispute about whether assignment of disproportionately many inexperienced teachers to certain schools deprives the children at those schools of "equal educational opportunities."

The district court granted the Government's motion on September 11, 1980, 498 F.Supp. 580, finding that the Board failed to meet its heavy burden to justify the continued existence of one-race schools in the parish. The first of the consolidated appeals now before the court involves the Board's challenge to this decision of the district court.[6] In light of its decision, the lower court found plaintiff-intervenors entitled to further relief from the vestiges of the dual system, and directed the Board to submit "a proposed plan for the additional desegregation of the public schools." The court articulated nine criteria to be used in developing the plan, the very first of which was the need to achieve a unitary school system. Finally, it stated that trial of the case, then scheduled for the following month, would be "limited to a consideration of the effectiveness" of the Board's proposed plan, along with other matters left unresolved from plaintiff-intervenor's 1974 motion for further relief.

The Board submitted its plan in January 1980, and trial on its effectiveness began March 3, 1981. Judge Parker opened the proceedings with a statement, the spirit of which is captured in this assurance: "As nearly certain as human events can be, when the public schools of East Baton Rouge Parish open in the fall of 1981, they will open under a court order for further desegregation of the races in this school system." He commented on the plans proposed by the Government and by the Board.

The Government's was flawed in that it required transportation of young children over long distances, along and across some of the most dangerous traffic arteries in the parish. It also appeared unnecessarily to "fractionate" elementary schools, thereby sending young children from one school building to another throughout their early educational years. The Board's plan, on the other hand, appeared to Judge Parker to offer little chance of achieving an adequate measure of desegregation. It would leave 39 one-race schools after full implementation, and even that moderate success would come only after the plan had been in place for three years. Finally, the court noted the age of the case and the probable length of further proceedings on appeal should a plan be imposed by the district court, and heartily encouraged the parties to confer in an effort to resolve matters in a consent decree. To that end, he ordered the parties, including the members of the Board, to meet privately together in chambers at the close of trial to establish an agenda for negotiations. He directed the parties to continue to meet thereafter according to their agenda and in light of the court's previously stated criteria for developing a desegregation plan.

Trial on the nature and potential effectiveness of the Board's plan took five days. On the last day of trial, March 11, 1981, the district court directed that negotiations among the parties take place in the federal courthouse and ordered all persons attending the meetings to maintain "absolute confidentiality of all matters reviewed, discussed or mentioned" during the course of the negotiations. The negotiators were allowed to issue press releases, but only jointly and with prior approval of the court.[7] The negotiations continued through early

---

530 (1970). The Board disputed the government's assertion that it assigned teachers on criteria that were not entirely race-neutral. The Board maintains that its teacher assignments are made without regard to race except insofar as consideration of race is necessary to achieve a racial balance of teachers in each school equivalent to that in the system as a whole.

**6.** The lower court certified its partial summary judgment order for immediate appeal pursuant to 28 U.S.C. § 1292(b) on October 8, 1980.

**7.** The court amended its order a few days later to require the parties to issue daily press releases "with concurrence of the court."

April, but on April 15, 1981 the parties informed the court that they were unable to agree on a desegregation plan. The next day, the court terminated the settlement discussions, noting that the requirement of confidentiality would remain in effect.

The district court responded with laudable dispatch to the parties' inability to agree on a desegregation method. Only two weeks after negotiations failed, the court entered its order considering and rejecting both proposed plans and describing its own. 514 F.Supp. 869 (M.D.La.1981). First, the court described the Board's magnet school plan and reviewed the testimony adduced at trial in support of the Board's proposal. The magnet school plan could not be accepted, however, "because it [left] nearly half the elementary students in one-race schools with no serious indication that the ratio [would] improve in the future." *Id.* at 873. Although the district court found greater promise in the Government's plan, it too was unacceptable because it proposed student transportation over distances too long and thoroughfares too dangerous.

The court's plan began with the three zones into which the Board had organized its magnet school proposal. Within those zones, it achieved desegregation of the elementary schools during the 1981–1982 school year by closing some older or inefficiently small schools and pairing or clustering the remaining elementary schools. The court found itself constrained by the facts of geography and by difficulties of transportation to allow eleven essentially one-race elementary schools to remain. As originally described, the court's plan desegregated EBRP's middle schools by transforming most into single-grade and a few into double-grade centers. 514 F.Supp. at 881–82. Considering this arrangement educationally unsound, the Board moved to amend the plan to return to three-grade middle schools. It first proposed several alternatives, no one of which enjoyed the full support of the Board. These were rejected because they failed to desegregate Scotlandville Middle School. On April 30, 1982, the court accepted the Board's second proposed middle school plan, but modified it to desegregate Scotlandville by mandatory assignment rather than by use of a language-development magnet program. Thus, the court's plan as actually implemented in the 1982–1983 school year desegregated EBRP's middle and high schools by establishing feeder patterns that would effectively eliminate all one-race middle schools and all but two one-race high schools.[8] Finally, the district court's plan contained a majority-to-minority transfer policy and several ancillary provisions relating, for example, to the Board's construction of new schools and use of temporary buildings. In the second of these consolidated appeals, every party except the United States challenges one aspect or another of the district court's remedial plan.

Two months after publication of the court's plan, on July 1, 1981, an organization called Parents for Neighborhood Schools, Inc. (PNS) moved to intervene as a defendant in the proceedings, arguing that the court-ordered confidentiality surrounding the March-April negotiations denied it and its members the right to be represented in the litigation and to confer with their elected representatives on the Board. Three weeks later, the Board moved the court to set aside the confidentiality requirement on constitutional and state statutory grounds. The court denied both motions after hearing, but eventually lifted the continuing requirement of confidentiality on November 22, 1982. Among today's consolidated appeals is PNS's challenge to the district court's denial of its motion to intervene.

The parties, the district court, and a master specially appointed for the purpose labored mightily during the 1981–1982 school year to implement the court's plan at the

---

8. The two remaining one-race high schools are Capital, 100% black, and Woodlawn, 87% white. Under the court's plan, these schools were designated "sister schools," with joint student-body meetings, joint faculty meetings, and periodic rotation of faculty and administrative personnel. 514 F.Supp. at 881.

elementary level, to tend details of the plan such as use of closed school buildings, and to prepare for the plan's implementation at the secondary level. We have already noted the district court's April 1982 amendment of its plan for desegregating EBRP's middle schools. Since the plan's implementation at the secondary level in 1982, the court has retained jurisdiction to oversee its operation and to insure that desegregation proceeds satisfactorily. In August 1982, the United States moved to stay the two appeals then pending in this court—one from the summary judgment on "liability" and the other from the district court's remedial plan as originally imposed. We granted that motion to allow the parties and the district court time to reevaluate the desegregation plan in light of experience and to consider a new plan drafted by Professor Christine Rossell and proposed to the Board by the United States. Although it claims still to be interested in the new plan, a newly elected Board rejected the United States' proposal in early 1983. We granted the Government's motion to lift the stay in March 1983.

II. *The Dual System*

 East Baton Rouge Parish operated separate schools for white and black children by force of law prior to 1954. Parish officials must therefore bear the continuing duty to eliminate "root and branch" the system-wide effects of that discrimination and to create a unitary school system untainted by the past. *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968); *see Dayton Board of Education v. Brinkman,* 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979); *Swann,* 402 U.S. at 15, 91 S.Ct. at 1275; *Ross v. Houston Independent School District,* 699 F.2d 218, 225 (5th Cir. 1983). Until that unitary system has been achieved, a district court overseeing the desegregation effort must retain jurisdiction to insure that the present effects of past segregation are completely removed. *Green,* 391 U.S. at 439, 88 S.Ct. at 1695; *Ross,* 699 F.2d at 225. When this case was last before us, we vacated the lower court's

judgment declaring the EBRP school system unitary and dismissing the case. 570 F.2d 1260 (5th Cir.1978). We now must determine whether the district court correctly held on remand that vestiges of the dual system remain in the EBRP public schools.

 We have noted in this case and in many others *Swann*'s general presumption against the maintenance of a system with substantially one-race schools. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. *E.g., Tasby v. Wright,* 713 F.2d 90, 94 (5th Cir.1983) (*Tasby III*); *Valley v. Rapides Parish School Board,* 646 F.2d 925, 937 (5th Cir.1981) (*Valley I*), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *Anderson v. Dougherty County Board of Education,* 609 F.2d 225 (5th Cir.1980); *Davis,* 570 F.2d at 1263. *Swann* places the burden squarely on the Board to demonstrate that the remaining one-race schools are not vestiges of past segregation. 402 U.S. at 26, 91 S.Ct. at 1281; *Tasby III,* 713 F.2d at 94. If further desegregation is "reasonable, feasible, and workable," *Swann,* 402 U.S. at 31, 91 S.Ct. at 1283, then it must be undertaken, for the continued existence of one-race schools is constitutionally unacceptable when reasonable alternatives exist. *Ross,* 699 F.2d at 228; *Lemon v. Bossier Parish School Board,* 566 F.2d 985, 987 (5th Cir.1978); *see Swann,* 402 U.S. at 26, 91 S.Ct. at 1281 (requiring "every effort to achieve the greatest possible degree of actual desegregation").

One-race schools unquestionably remained in the EBRP school system at the time the district court determined that the system was not yet unitary. Although the system's 1978–1979 student population was 40% black and 60% white, over half the parish's 113 schools served student bodies over 90% one race and over half of the parish's school children attended schools in which theirs was the majority race by at least that disproportionate a margin. Indeed, only 35 schools in the parish served student bodies less than 80% one race. As the district court put it, "one is entitled to be surprised that after 16 years of desegregation efforts by the school board, 78

[schools] (70 percent of all schools) were still at least 80 percent black or 80 percent white." 498 F.Supp. at 584 n. 3. This Board labored under an exacting burden to show that so throughly segregated a system was not the vestigial consequence of past discrimination.

■ The Board's major justification for the continued existence of so many one-race schools is that they result from the "perfectly normal phenomenon of ethnic residential preference and impaction" for which school officials bear no responsibility. The argument fails both on its own premise and as a principle of law. First, the district court found and the undisputed facts reveal that the Board's pattern of school construction and closings since 1954 has contributed substantially to perpetuating the racial segregation imposed by law prior to *Brown I.* 498 F.Supp. at 584. Twenty-two all-black schools existed in the parish in 1954. Of those, 12 remained over 95% black when the district court granted summary judgment 26 years later. The Board has built 76 new schools since 1954, fully 73 of which opened to serve student bodies over 90% one race. Of the 36 new schools built since desegregation efforts began in 1963, at least 21 had student bodies over 90% one race in 1980. Thus, the Board has apparently located its new schools to serve single-race attendance districts. Furthermore, despite an annual redistricting process, the Board has routinely reacted to overcrowding in certain of its schools, generally those serving white neighborhoods, by erecting temporary classrooms rather than by redrawing district lines to send children to underused school facilities in other neighborhoods. The racial isolation of many of the schools in the EBRP system, therefore, is in this important respect the result of the Board's conduct since 1954. *See Swann,* 402 U.S. at 20–21, 91 S.Ct. at 1278–79.

The Board's reliance on housing patterns as justification for the continued existence of one-race schools is not only factually but legally unsound. The Board does not argue at this juncture that residential patterns rendered further desegregation of the remaining one-race schools unworkable. Instead, it contends that EBRP school officials bore no responsibility to eliminate the many one-race schools that existed in 1980 because the racial identifiability of those schools was caused neither by actions of the Board nor by the prior dual system but by actions of private individuals who chose to live in racially homogeneous neighborhoods.

■ Until it has achieved the greatest degree of desegregation possible under the circumstances, the Board bears the continuing duty to do all in its power to eradicate the vestiges of the dual system. That duty includes the responsibility to adjust for demographic patterns and changes that predate the advent of a unitary system. *Lee v. Macon County Board of Education,* 616 F.2d 805, 810 (5th Cir.1980); *United States v. Board of Education of Valdosta,* 576 F.2d 37, 38 (5th Cir.), *cert. denied,* 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978). The racial isolation of some schools, whether existing before or developing during the desegregation effort, may render disestablishment of certain one-race schools difficult or even impossible. Until all reasonable steps have been taken to eliminate remaining one-race schools, however, ethnic housing patterns are but an important factor to be considered in determining what further desegregation can reasonably be achieved; they do not work to relieve the Board of its constitutional responsibilities. *Valley I,* 646 F.2d at 937. Changes in neighborhood ethnicity taking place after school officials have transformed their system into a unitary one need not be remedied, of course, for school officials are under no duty to adjust for the purely private acts of those who chose to vote with their feet. *Pasadena County Board of Education v. Spangler,* 427 U.S. 424, 435–37, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976); *Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1283–84. But until it can show that all reasonable steps have been taken to eliminate remaining one-race schools, the Board must in its pursuit of a unitary system respond as much as reasonably possible to patterns and changes in the demography of the parish.

The Board also urges a finding of unitariness on the familiar ground that desegregation of the remaining one-race schools, over half the schools in the parish, would drive families from the parish and white children from its public schools. This is not a case like *Ross v. Houston Independent School District,* 699 F.2d 218 (5th Cir. 1983), or *Calhoun v. Cook,* 522 F.2d 717 (5th Cir.), *reh'g denied,* 525 F.2d 1203 (5th Cir. 1975), in which residential patterns, population migration, or the departure of white students from the system rendered further desegregation of one-race schools unfeasible. Rather, this is a case in which by 1980 the desegregation of the public schools had simply not yet been achieved. The Board's legitimate fear that white students would depart the public school system during the difficult period of active desegregation was cause for "deep concern" and creative solutions but could not justify a retard in the process of dismantling the dual system. *United States v. Scotland Neck City School Board,* 407 U.S. 484, 490–91, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972).

Finally, the Board contends that the racial disparity existing in the EBRP school system is not the result of intentional discrimination and can therefore not ground suit under the Fourteenth Amendment. The Board supports its argument by citing several cases requiring proof of intentional discrimination in order to state a claim under the Fourteenth and Fifteenth Amendments. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Cases such as these simply do not apply "where a statutory dual [school] system has ever existed." *United States v. Texas Education Agency,* 564 F.2d 162, 165 & n. 2 (5th Cir.1977) (*Austin III*) (quoting *Keyes v. School District No. 1,* 413 U.S. 189, 201, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973)), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979). "[T]he measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system. As was clearly established in *Keyes* and *Swann,* the Board had to do more than abandon its discriminatory purpose." [9] *Dayton Board of Education v. Brinkman,* 443 U.S. at 538, 99 S.Ct. at 2979 (citations omitted). *See Price v. Denison Independent School District,* 694 F.2d 334, 378 (5th Cir.1982) (on suggestion for rehearing).

Upon consideration, we entirely agree with and uphold the district court's determination that the EBRP school system as it existed in 1980 remained tainted with the vestiges of the statutory dual system. So many one-race schools with so profound an impact on the students in the parish was unacceptable under *Brown I, Swann,* and their progeny. The district court properly held that more could well be done to alleviate the incidence of one-race schools in the parish. We now turn to the plan imposed by the district court to achieve that end.

### III. *The Remedy*

#### A. *The Board's Proposal*

When a school system has been found to be in violation of the Constitution, local school officials bear the primary responsibility to "eliminate from the public schools all vestiges of state-imposed segregation." *Milliken v. Bradley,* 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977) (*Milliken II*) (quoting *Swann,* 402

---

**9.** The Board cites language from *United States v. Gregory-Portland Independent School District,* 654 F.2d 989 (5th Cir.1981), to the effect that the existence of one-race schools does not necessarily establish segregative intent. *Id.* at 1005 n. 23. *Gregory-Portland* involved a claim of discrimination not between black and white children, who had been segregated by law before *Brown I,* but between Anglo and Mexican-American students as to whom there had never been de jure segregation. *Swann*'s one-race school presumption therefore did not apply, *id.* at 994, and its mention in *Gregory-Portland* indicated only that even in a de jure case the presumption against one-race schools is rebuttable.

U.S. at 15, 91 S.Ct. at 1275); *Brown II,* 349 U.S. at 299–300, 75 S.Ct. at 756. But the continued existence of one-race schools under a plan proposed by school officials is unacceptable where reasonable alternatives exist. *Lemon,* 566 F.2d at 987. When school officials fail to "come forward with a plan that promises realistically to work, and promises realistically to work *now,*" *Green,* 391 U.S. at 439, 88 S.Ct. at 1694, it becomes the responsibility of the district court to develop an adequate remedy. *Swann,* 402 U.S. at 15, 91 S.Ct. at 1275; *Valley I,* 646 F.2d at 938.

The Board proposed to dismantle the dual system by dividing the parish into three east-west zones and designating in each zone certain schools at each educational level to provide magnet or special focus programs. These magnet programs would attract voluntary attendance by students of the race substantially unrepresented at the schools in which they were installed, and desegregation would thereby be achieved. The theory was and is entirely commendable, for it relies not on the court's mandatory power but on the voluntary choices of individual parents and students.[10] We cannot overemphasize the importance of creativity in the fashioning and implementation of a desegregation plan. Creative solutions bring local acceptance and enthusiasm—ingredients crucial to the success of any desegregation effort.

The district court properly rejected the Board's plan, however, because it would not have been fully implemented for three years and because in the face of reasonable alternatives it left too many one-race schools in the system. Although the plan did include a few pairs and clusters, it would have allowed at least 39 essentially one-race schools to remain in the system, with 48% of the parish's elementary students continuing to attend one-race schools. The Board's stated goal was to achieve at least a 25%–75% racial balance in its magnet schools by their third year in operation;

of course, no witness at trial could guarantee even that modest success. Furthermore, many if not most of the magnet programs would have been "added on" to the curriculum and activities existing at their designated school, creating the danger that they would become, in the district court's phrase, "a school within a school." 514 F.Supp. at 872.

The district court found that further desegregation than that achieved by the Board's proposal was feasible and workable. In upholding that determination, we do not mean to suggest our disapproval of other magnet school plans that may promise greater remedial success than the Board's. We encourage the parties to continue to work on creative alternatives to the mandatory tools of desegregation.

## B. *The Court's Plan*

Presented with an inadequate plan by the Board, the district court was responsible "to use its broad and flexible equitable powers to implement a remedy that, while sensitive to the burdens that can result from a decree and the practical limitations involved, promises 'realistically to work *now.*'" *United States v. DeSoto Parish School Board,* 574 F.2d 804, 811 (5th Cir.1978) (quoting *Green,* 391 U.S. at 439, 88 S.Ct. at 1694)). Its remedy must "restore the victims of discriminatory conduct to the position they would have enjoyed ... in a school system free from pervasive *de jure* segregation." *Milliken II,* 433 U.S. at 282, 97 S.Ct. at 2758. This the court did admirably.

The Board's major challenge to the remedy originally imposed by the district court is that its own plan was not accepted. Having rejected that argument, we find the Board's remaining objections rooted primarily in its fear that implementation of the court's more thorough plan would drive white students from the system. That fear may be well-founded; counsel for the Board informed us at oral argument that

---

10. We do note, however, the argument of plaintiff-intervenor NAACP that so pervasive a use of magnet schools as was contemplated in the

Board's plan raises the specter of yet another dual system: one white and magnet, the other black and public.

the system has lost some 7,000 students— mostly elementary students—in the two years since the court's plan has been in effect. The latest information available to the court, submitted in October 1983, indicates that the system's student population is now roughly 50% white and 50% black.

As we have noted, fear that white students will flee the system is no justification for shrinking from the constitutional duty to desegregate the parish schools. *Scotland Neck,* 407 U.S. at 491, 92 S.Ct. at 2218; *Ross,* 699 F.2d at 226; *Lee v. Macon County Board of Education,* 465 F.2d 369 (5th Cir.1972). Our courts have long held that the process begun by *Brown I* will not be delayed to accommodate those who oppose the dismantling of dual school systems. *See Morgan v. Kerrigan,* 530 F.2d 401, 420 (1st Cir.1976), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1977). The Board has submitted no adequate time-and-distance studies to show that the student transfers contemplated by the court's plan are unduly burdensome, *see Ross,* 699 F.2d at 226; *Tasby v. Estes,* 572 F.2d 1010, 1014 (5th Cir.1978) (*Tasby II* ), *cert. denied,* 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980) (such studies crucial in assessing feasibility of *Swann* techniques for further desegregation), nor has it even come forward with facts demonstrating a correlation between the distance a student must travel under the plan and the likelihood that the student will transfer from that system. Indeed, counsel for the Board conceded at oral argument that the primary reason for students leaving the system is not the distance they are assigned to travel but "where they're going to wind up and where they're having to leave from." To accommodate their concern by delaying desegregation would be to ignore our responsibility under *Brown I, Green,* and *Swann.* Further use of special programs designed to make the desegregated schools more attractive to students and parents and thereby minimize white flight is entirely appropriate, as long as the cause of desegregation is not frustrated. *See Stout v. Jefferson County Board of Education,* 537 F.2d 800 (5th Cir. 1976) (court may chose among *permissible*

plans the one likely to minimize white flight). So too are methods of oversight, such as this district court's 1982 effort to determine the extent to which EBRP students had transferred inappropriately to schools in neighboring parishes. "White flight" must be met with creativity, not with a delay in desegregation.

The Board also challenges what it perceives as the district court's inappropriate effort to achieve in each parish school a racial balance roughly approximating that in the system as a whole. The remedial power of the federal courts may be exercised "only on the basis of a constitutional violation" and is defined by the nature and scope of the "condition that offends the Constitution." *Swann,* 402 U.S. at 15–16, 91 S.Ct. at 1276; *Milliken I,* 418 U.S. at 737–38, 94 S.Ct. at 3123–24. The district court found, and we agree, that the substantial racial segregation prevailing in EBRP's public schools even as late as 1980 was a vestige of the statutory dual system maintained over the decades since *Brown I* by the Board's "classic pattern of building schools specifically intended for Negro or white students." *Swann,* 402 U.S. at 20, 91 S.Ct. at 1278. The Board having failed to show that any of the one-race schools were not the result of present or past discrimination, *id.* at 26, 91 S.Ct. at 1281, the district court was obliged to apply its broad remedial powers to "expunge from the public schools all vestiges of unlawful segregation." *Valley v. Rapides Parish School Board,* 702 F.2d 1221, 1225 (5th Cir.1983) (*Valley II* ).

The resulting desegregation plan was not designed to achieve in every school the precise racial mix prevailing throughout the system. The district court recognized that it was bound to consider the system as a whole, and expressly rejected "the proposition that it is necessary to define to the fractional percentage point an acceptable range of racial mix in any particular school." 514 F.Supp. at 873. The court understood that, if necessary, a few racially homogeneous schools may remain; indeed,

finding no reasonable alternative, it felt constrained to allow eleven elementary schools and two secondary schools to remain entirely or substantially one-race. A review of the plan, particularly its anticipated results, *id.* at 883–84; R. 2323 (middle school modification), reveals that "the use made of mathematical ratios was no more than a starting point in the process of shaping a remedy." *Swann,* 402 U.S. at 25, 91 S.Ct. at 1280. We surely cannot fault the lower court, in the absence of an adequate proposal by the Board, for considering the system's overall racial balance "a useful starting point" in shaping its remedy. *Id.; North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

Plaintiff-intervenors, particularly the NAACP, contend that the court's plan does not go far enough.[11] Their major complaint is that desegregation of the eleven elementary schools and two high schools that remain essentially one-race under the plan can be accomplished without transferring students unreasonably long distances or over unreasonably dangerous routes. They also argue that the plan places on black students the major burden of the desegregation effort.

Each time the district court determined that a particular school must remain one-race, it supported that decision with careful findings explaining the circumstances, typically the racial isolation of the school, that required the school's exclusion from the plan. *See* 514 F.Supp. at 877–82. It also carefully explained its decision each time it ordered a school closed. *See id.* at 876–77. Certain conclusions made by the district court seem odd from this distance; it chose to close Scotlandville High School, for example, while allowing nearby Scotlandville Middle School to remain open. But the record is far from adequate to base a determination that the lower court abused its broad equity powers in any of its decisions. *See Milliken II,* 433 U.S. at 288, 97 S.Ct. at 2761; *Tasby III,* 713 F.2d at 97; *Valley II,* 702 F.2d at 1225. We also must

reject the claim that the court's plan places the burden of desegregation disproportionately on black students. *See Valley II,* 702 F.2d at 1228. Although it does appear that the district court found it necessary to close more formerly all-black schools than formerly all-white schools, 514 F.Supp. at 875–76, 880, 881, we cannot on this record find the abuse of discretion necessary to reverse.

The procedure followed in the district court produced the court's plan full-grown, however, and the parties had little opportunity to test the facts on which certain of the court's discretionary decisions were based. The NAACP argues before us, for example, that neither Capital nor Scotlandville High School are in fact racially isolated. Our review of the record reveals a district judge entirely willing to reconsider aspects of the plan alleged and shown to be flawed. Indeed, when told by the Board that it found the single- and double-grade middle school centers educationally unsound, Judge Parker requested an alternative plan and, when one was presented that could be modified to achieve the same level of desegregation with multi-grade middle schools, scrapped the original version and embraced the alternative. We assume that the district court will be equally receptive to plaintiff-intervenor's contentions, consideration of which is within the continuing jurisdiction of that court.

### C. *The Later Appeals*

The Board also raises several points in the two later appeals concerning details of implementation and administration of the court's plan. First, we find no abuse of the lower court's discretion in its decision to desegregate all-black Scotlandville Middle School by ordering transfers of white students from Baker and Northwestern Middle Schools. The district court acceded to the Board's request to return to multi-grade middle schools; it rejected the Board's proposed language magnet program for Scotlandville, however, choosing instead to desegregate Scotlandville by mandatory stu-

---

11. The United States supports the court's plan.

dent transfers.[12] The fact that these transfers led to an unbalance in the racial percentages among Scotlandville, Baker, and Northwestern is of little importance in light of the need to desegregate all three schools effectively.

■ The Board also urges us to reverse the lower court's imposition of racial quotas at Scotlandville Middle School and Baton Rouge High Magnet School (BRHMS). The district court almost immediately amended its order imposing the 60%–40% quota at Scotlandville to apply only during the 1982–1983 school year. It is therefore now moot. Other aspects of the court's method of desegregating Scotlandville, such as the requirement that the Board continue to monitor the racial balance at the school and propose "corrective measures" should it become skewed, were entirely within its discretion given the peculiar difficulty of desegregating the school.

The admission quotas at Baton Rouge High Magnet School present quite a different problem.[13] BRHMS has been a magnet school since 1972, and remained so under the district court's plan. Shortly after that plan was announced, the Board responded to a court order and submitted in writing its policy governing admissions to magnet schools. Under the policy, the Board would select applicants, both to its magnet middle and its magnet high schools, from two separate lists: one of white students and one of black students. The Board would fill seats from the separate lists to allow a racial balance at each school of 60% white students and 40% black students. If by April 1 of each year, however, the seats at a magnet school reserved for a particular race had not been filled, they would be opened to students of the other race. The district court approved this admission policy. Several months later, the Board sought "clarification" of its policy; all spaces at BRHMS

allotted to white applicants had been filled, and it asked permission to admit other "gifted and talented" applicants, presumably white, to the school. The court denied the request, noting among other things that "almost all students who are certified as 'gifted and talented' are white" and that the number of "gifted and talented" certifications had inexplicably doubled for the 1981–1982 school year. A year later, the court responded to confusion over the attendance zones of the two magnet high schools—another had been created at Scotlandville High—by "modifying" the Board's magnet school admissions policy "to eliminate that portion of the policy which permits white student applicants to be admitted in any proportion greater than 60% of the total enrollment." The Board now challenges the policy, as modified.

■ *Swann* disapproves the use of "fixed mathematical racial balance[s]," for the Constitution does not guarantee that every school will reflect the racial composition of the system as a whole. 402 U.S. at 23–24, 91 S.Ct. at 1280. But the application of a minority quota to EBRP's magnet schools is not designed to achieve a racial balance in every school. Instead, it is designed to assure to the greatest extent possible that these voluntary attendance schools not work to undermine the progress of desegregation in the parish. In this way, the Board's valued use of magnet schools is preserved. The First Circuit has specifically approved application of a racial quota in admissions to magnet schools "to ensure that they would not serve as a haven for those seeking to attend a school predominantly composed of those of their own race." *Morgan v. Kerrigan,* 530 F.2d 401, 423 (1st Cir.1976). We agree.

The remaining "issues" raised by the Board in the later appeals call for no detailed treatment. For the most part, they

12. Testimony at the hearing on the matter by no means instilled confidence that the language program would effectively desegregate Scotlandville Middle. Tr. at 22–62 to 22–69.

13. The Board filed notices of appeal from only two orders relevant to the quota at BRHMS:

that imposing the court's original desegregation plan and that approving the Board's magnet school admission policy as first submitted. These notices were sufficient to bring the issue before us.

either represent mere squabbles, such as fixing the blame for white flight, or raise matters not properly before us, such as the Government's new Rossell Plan.[14] As an appellate court, we must decline to become enmeshed in the many administrative details necessarily encountered in the continuing process of reevaluating and implementing a desegregation plan as thorough as that imposed in this case. From the beginning, appellate courts considering school-desegregation cases have relied heavily on their counterparts at the district level who enjoy far greater familiarity with local conditions and needs. *Milliken II,* 433 U.S. at 287 n. 18, 97 S.Ct. at 2760 n. 18; *Brown II,* 349 U.S. at 299–301, 75 S.Ct. at 756. The district judge in this case is now intimately and quite appropriately involved in the desegregation of the East Baton Rouge Parish public schools. Proposals for specific or far-reaching changes will no doubt find a willing ear and be ably considered if addressed to the district court. We can only encourage the parties to cooperate with each other and with the court toward the goal that all know must eventually be achieved—a unitary school system in the parish.

## IV. *Intervention*

Parents for Neighborhood Schools claims that it was entitled to intervene because the court-ordered confidentiality surrounding the March-April 1981 negotiations[15] deprived its members of their asserted right to participate in those negotiations. They do not challenge any specific aspect of the desegregation order imposed after negotiations failed. Instead, they argue that they had a right to participate in the negotiations, either directly or by open communication with the members of the Board, and

that denial of that right infected the entire process. They would therefore suspend operation of the court's desegregation plan and turn back the clock over two years to allow another effort at negotiation.

We have long held that intervention in a school desegregation case is properly denied if the issues presented by the new group "had been previously determined," or if the existing parties were aware of those issues and were completely competent to represent the interests of the new group. *Hines v. Rapides Parish School Board,* 479 F.2d 762 (5th Cir.1973). Here, as in several of our previous cases, " 'the parents are not seeking to challenge deficiencies in the implementation of desegregation orders.' They oppose such implementation." *Pate v. Dade County School Board,* 588 F.2d 501, 503 (5th Cir.1979) (quoting *United States v. Perry County Board of Education,* 567 F.2d 277, 279 (5th Cir.1978)). We find absolutely nothing in the record to suggest that the Board was in any way inadequate in representing the stated interest of these parents in a return to the freedom-of-choice method of desegregation. The parents may have lacked direct or indirect access to the negotiations among the parties, but there is nothing sinister about "closed door" negotiations in which the interest of the parents was adequately represented. *See Jones v. Caddo Parish School Board,* 704 F.2d 206, 221 n. 25 (5th Cir.1983). Theirs was the right to adequate representation at the negotiations, not the right to negotiate directly.

We therefore conclude that the district court was correct in denying PNS the right to intervene.

---

**14.** We find particularly unmeritorious the Board's argument that this district court has exceeded its power by becoming overly involved in the workings of the parish school system. Its monthly status conferences, its requirement that the Board submit reports and other information, and its oversight of matters such as the upgrading of the parish's school facilities all betoken a careful and attentive judge. The time will come, of course, when

this level of involvement will ebb; that time is not yet here.

**15.** Both the Board and PNS appeal the orders imposing and amending the requirement of confidentiality. The district court lifted the confidentiality requirement on its own motion by order dated November 22, 1982. Challenges to the validity of that requirement are therefore now moot, and it remains relevant only insofar as it relates to the right of PNS to intervene.

### V. *Conclusion*

Our review of this record indicates a school system well on the way toward desegregation. With confidence in Judge Parker and hope that all will cooperate to the end that a unitary system can be achieved without injury to the quality of education in the parish, we AFFIRM the decisions of the district court and REMAND for further proceedings.